[Civ. No. 24887.   First Dist., Div. One.   June 25, 1969.]

MARY A. GLUNT et al., Plaintiffs and Appellants, v. CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

Myrick & Deering & Scott, James Walter Scott, Jr., Young, Rabinowitz & Chouteau and H. S. Young for Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, and Norman Sanford Wolff, Deputy City Attorney, for Defendant and Respondent.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and Edward P. Hollingshead, Deputy Attorney General, as Amici Curiae on behalf of Defendant and Respondent.

ELKINGTON, J.—This appeal concerns the statutory procedures through which title to real property on which county taxes are delinquent passes to the State of California and ultimately to the state's vendee. The action below was brought by the heirs of Willis B. Brinker, deceased, to cancel a tax deed from the state to the City and County of San Francisco, and for a declaration of the respective rights of the parties. The action, being equitable in nature, was tried by the court. The appeal is from a judgment in favor of defendant City and County of San Francisco (San Francisco).

For the reasons hereafter stated we have concluded that the judgment must be affirmed.

The deed at issue purports to have been executed under the provisions of Revenue and Taxation Code sections 3791-3814, article 2, chapter 8, part 6, division 1. (Hereafter all statutory citations, unless otherwise stated, will be to Revenue and Taxation Code.)

Section 3806, as pertinent here, provides: "Except as against actual fraud, the deed is conclusive evidence of compliance with this article and otherwise has the same effect as evidence and as a conveyance as a deed to a private purchaser after sale of tax-deeded property. . . ."

Plaintiffs contend that the evidence conclusively establishes *actual fraud* on the part of San Francisco in the acquisition of the subject real property (which we shall call "the land") and the deed thereto. San Francisco submits (1) that the trial court's determination that there was no actual fraud is supported by substantial evidence; (2) that the action is barred by the one-year statute of limitations of section 3809; and (3) that deceased, his executor, and plaintiff heirs, having failed to pay or tender payment of taxes admittedly due, may not contest the tax proceedings at issue.

We proceed to state the evidence relating to these issues in the light most favorable to San Francisco, the prevailing party below, giving to the city the benefit of every reasonable inference and resolving all conflicts in support of the judgment. Where, as here, it is contended that the court's findings lack evidentiary support, our power begins and ends with a determination whether there is any substantial evidence, contradicted or uncontradicted, in support of the court's findings and judgment. (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.*, 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805]; *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183].)

The land is described on the records of the San Francisco Assessor and Tax Collector as lot 1, block 410B. It is submerged under the waters of San Francisco Bay, lying not far from the municipal yacht harbor. Since 1930, with other underwater land, it has been the subject of occasional consideration by San Francisco for possible inclusion in future extensions of its yacht harbor. This consideration was a matter of public information. It was not until 1961, however, that definite plans for such inclusion were made.

Deceased Willis B. Brinker acquired the land by foreclosure around 1940. He thereafter redeemed it from a tax sale by paying all delinquent taxes through the tax year 1945-1946. At his request, legal title to the land was held for him by Title Insurance and Guaranty Company until 1958.

In 1942, counsel for Brinker contacted an official of San Francisco's real estate department about a sale of the land to the city. He was told: "It is not the proper function of this department to recommend the purchase of property, and I suggest that if you feel the property can be sold to the city, the proper department, which in this case is the park department, should make the recommendation. We would then come into the picture to a determination of the proper value." The attorney then wrote to the park department and received the following reply: "Your recent letter addressed to Commissioner Lermen of the Board of Park Commissioners, stating that property belonging to your client in the vicinity of Yacht Harbor was now released from litigation, and inquiring if the Park Commission was interested in its acquisition, has been referred to Mr. Joseph R. Hickey, Director of Recreational Activities, for investigation and report at the next regular meeting of the Board on August 13, 1942. [ ¶ ] You will be informed of any future action taken in this matter." About three weeks later the secretary of the park department informed Brinker's counsel of the action. He stated: "I have been instructed by the Board of Park Commissioners to forward you the attached report, . . . It was the consensus of opinion of the Park Commissioners that the purchase of this property should not be considered for the duration of the war." The accompanying report recited, in part, "Personally I fail to see where we could recommend the purchase of any additional property for the development of the Yacht Harbor when we are so far behind in the completion of the existing units, furthermore we never have approved a complete plan for this project."

In 1946 the land was assessed taxes of $877.46. These taxes going unpaid, on June 30, 1947, the land was sold pursuant to section 3436, to the State of California for nonpayment of taxes. Taxes for the succeeding years through 1951-1952 also were not paid, resulting in the land being *deeded* to the state on July 7, 1952. (§ 3511.) On this latter date the total tax delinquency, exclusive of penalties and interest, was $6,491.14. From 1953 San Francisco's assessment roll carried the land as "state property"; it was no longer assessed to Title Insurance and Guaranty Company, which company was the last record assessee.

On February 6, 1958, Brinker's attorney wrote to the tax collector. stating that record title to block 410B, lot 1 (the land), was in "Title Insurance and Guaranty Company, now Western Title Insurance Company, subject to a holding agreement. Mr. Brinker is in a position and proposes to redeem this property. [¶] We would appreciate your furnishing us a statement of the amount of taxes, penalties, costs and interest now due. Can you also advise us of the amount that Mr. Brinker must pay to avail himself of the benefits of section 4217 Revenue and Taxation Code?" The tax collector replied February 14, 1958: "The above property was sold to the State for taxes on June 30, 1947 and deeded to the State in July, 1952. [¶] The total amount of taxes, penalties, interest and costs now due is $16,191.23 and that amount must be paid in full in order to redeem the property. [¶] Sec. 4217 of the Revenue and Taxation Code was amended in 1957 so that no.installment payment may be made after property has been deeded to the State. [¶] The amount necessary to redeem increases each month and the figure given above is the amount which may be paid during February, 1958."

On the same date, February 14, 1958, Brinker's counsel talked to San Francisco's City Attorney about the land. They inquired, "[W]ould the city buy it. Could we make a deal." Describing the visit, counsel said, "We were salesmen trying to sell our merchandise." The city attorney said something about a lack of funds.

Brinker died May 2, 1959. A bank was appointed executor of his estate. His attorneys, becoming counsel for the executor, promptly communicated all information in their files that would aid the bank in administering Brinker's estate, including the hereinbefore mentioned letter from the tax collector stating that the land had been deeded to the state and specifying the amount required to redeem. The executor and its

attorneys admitted knowing that the land had been sold to the State of California at a tax sale.

In September 1959 and October 1960 Brinker's attorneys, acting for his executor, contacted city officials about municipal plans for the land. They were told that no existing plans embraced the use of the subject property.

Thereafter, San Francisco reached an agreement with the state to purchase the land, on which it had been denied tax revenue totaling $22,798 since 1946, for $5. Notice of the sale was published, and mailed to and received by the last assessee, under its new name, Western Title Insurance Company; the notice stated that the sale would take place not less than 21 days after June 2, 1961 (see §§ 3796-3799).

On June 8, 1961, in response to a letter from Brinker's former attorney who was then acting for the executor, the city's director of property telephoned ''to tell him that notices had been published regarding the tax sale of the property in question, Block 410B, and that there was a redemption period of 21 days [from June 2] in which the owner, the record owner of the property, would have to take some action. And I wanted to call this to Mr. Young's attention, which I did by telephone.''

However, as previously indicated, the delinquent taxes were not paid and the land was not redeemed. On June 27, 1961, a deed covering the subject land, pursuant to the agreement, was executed by the state and delivered to San Francisco. Thereby, under the provisions of section 3807, all rights to redeem the land from the sale to the state were terminated.

To this date neither Brinker, his executor, the plaintiff heirs, nor anyone, has paid or tendered payment of, all or any part of the taxes assessed against the land since the tax year 1945-1946.

Brinker's estate was appraised at $2,641,722. At the time of his death he was the owner of approximately 1,500 parcels of real property. He had, with the exception of the land here at issue, regularly paid all of his property taxes. On the date, February 14, 1958, that his attorneys were advised of the amount required to redeem the land, Brinker owned a bank deposit of $412,435. The land was inventoried in Brinker's estate and appraised at $4 500.

The greater part of Brinker's 1,500 odd parcels of real estate had been acquired by him at tax sales. His attorneys were involved in ''lengthy quiet title matters.'' There were

"acres and acres of property that [they] had to straighten out and quiet title actions had to be brought and the property had to be made marketable." Some of the quiet title actions "included hundreds of people."

Plaintiffs place great emphasis on what they characterize the "unimpeached" testimony of an officer of the executor bank. This witness testified that in early August 1959 he telephoned an employee, Mr. Conti, of the tax collector's office, inquiring whether any taxes were due on the land. The employee (who at the time of the trial was deceased) orally stated that "he could find no record of any outstanding taxes due on the property nor could he find any record of any tax bills having been issued on the property; that the area involved was not on the tax rolls that he could determine; and that there were some questions out there in that area as to ownership of the property; that there were various State of California and Federal Government claims; and that one thing was definite; that the property was not on the tax rolls of the City and County of San Francisco and that as far as he could determine, there were no tax bills available on it, and that there were no records that he could find of any delinquent taxes and doubted very much that there were any tax bills that were ever forthcoming on the property."

It is noted that the gist of Mr. Conti's alleged statement was that the land was not on the tax rolls and he could find no record of delinquent taxes against it. Such a statement was quite consistent with the records available at the tax collector's office. The land was *not* on the tax rolls, having been sold 12 years earlier to the state. ■ And the records of delinquent taxes due on such property are the responsibility of the redemption officer, the county controller (auditor), not the tax collector. (§ 120.)

The bank officer later admitted that at the time of the foregoing telephone conversation he had been informed, and knew, that there were delinquent taxes against the land; he had discussed that subject with the executor's attorney. And as stated, the amount required to redeem the land was readily available to him from the county controller. It has been said that such testimony concerning statements of a deceased declarant "constitute[s] the weakest and most unsatisfactory of all kinds of evidence." (*Lohman* v. *Lohman,* 29 Cal.2d 144, 149 [173 P.2d 657].) ■ In any event the bank officer's testimony at most created a conflict, which we must infer the trial court resolved against plaintiffs.

From our view of the evidence, including such portions as we have set forth, we conclude that the trial court could reasonably have determined, and properly determined, that San Francisco and its officers and agents were innocent of fraud, actual or otherwise, in the acquisition of the subject deed and land. Accordingly, there is substantial evidence in support of the court's finding of no actual fraud.

Plaintiffs argue that there were deficiencies in the tax proceeding leading to the execution and delivery of the subject deed to San Francisco. While our examination of the record indicates substantial compliance with the pertinent statutes, such a determination has become unnecessary and irrelevant. As previously pointed out, section 3806 provides: "Except as against actual fraud, the deed is conclusive evidence of compliance with this article. . . ." Code of Civil Procedure section 1837 (in effect at the time of the trial) provided: "Conclusive or unanswerable evidence is that which the law does not permit to be contradicted. . . ."

Revenue and Taxation Code section 3809 provides:

"A proceeding on alleged invalidity or irregularity of any agreement or deed executed under this article can only be commenced within one year after the execution of the instrument."

Plaintiffs' action was commenced more than two years after the execution of the subject deed. They contend that San Francisco's fraud prevented the running of the statute of limitations. Since the trial court, on substantial evidence, determined that there was no fraud this contention is without merit. Plaintiffs' action therefore, as found by the trial court, was barred by the operation of the one-year statute of limitations prescribed by section 3809.

There is yet another reason why plaintiffs may not prevail; they, their predecessor Brinker, and Brinker's executor, have not done equity. As indicated, neither payment of, nor offer to pay, the taxes properly assessed against the land has ever been made. Even in the pending lawsuit no such tender appears. The conclusion is inescapable that none of the interested parties had, or has, any intent to pay these taxes unless and until such payment, in effect, can be made from the proceeds of a sale of the land to San Francisco.

This lack of equity is particularly apparent as to Brinker. The evidence indicates that the greater part of his estate had been accumulated by him at "tax delinquent" sales. Al-

though he paid taxes on over 1,500 other pieces of real property he steadfastly paid none on the land at issue. The obvious reason was the questionable marketability and value of underwater land; he would not risk the tax payments until he was assured of San Francisco as a buyer. He therefore allowed thousands of dollars in delinquent tax assessments to accumulate against the land.

An owner of property has an equitable and moral obligation to pay his taxes; such obligation has been held to be one of the highest civic duties of a citizen. Courts of equity will not restrain or set aside tax proceedings, even if erroneous, at the instance of one who, without cause, fails to pay or offer to pay, such taxes as he admittedly owes.

In *Couts* v. *Cornell*, 147 Cal. 560 [82 P. 194, 109 Am.St. Rep. 168], California's Supreme Court applied the foregoing rule. There the plaintiff sought to set aside tax sales, which were admittedly invalid. He was denied relief because of his failure to pay, or tender payment of, taxes concededly due. The court said (pp. 561-562) : "The plaintiff comes into a court of equity admitting that he should have paid on account of this property the exact sum originally charged against it; that this was no more than his fair share of the public burden which he, in common with all other taxpayers, must bear for the support of the government whose protection he enjoys. [ ¶ ] We think the case thus presented is without equity, and that on the familiar principle that he who seeks equity must do equity, the plaintiff should be denied the equitable relief which he demands. The obligation to pay his just proportion of the taxes legally levied is one of the highest civic duties of the citizen to the state. . . ." (See also *Esterbrook* v. *O'Brien*, 98 Cal. 671, 673 [33 P. 765] ; *Merchants Trust Co.* v. *Hopkins*, 103 Cal.App. 473, 484 [284 P. 1072].)

Plaintiffs contend that Brinker's right to redeem the land after its 1947 sale to the state (§ 4101) was property which, upon his death, by virtue of Probate Code section 300, became "subject . . . to the control of the superior court for the purposes of administration, sale or other disposition." Accordingly, they say, the right to redeem the land was in *custodia legis,* and beyond the power of the state to defeat by its sale to San Francisco in 1962. (See § 3807.) Specifically, it is argued that consent of the superior court was necessary to give validity to the sale.[1]

---

[1]Houston I. Flournoy, the Controller of the State of California, has filed an *amicus curiae* brief in support of the trial court's judgment on this issue. The introduction to this brief states: "Moreover, were appel-

■ The so-called *right* to redeem property *after* its sale to the state has been described by the Supreme Court in *Mercury Herald Co.* v. *Moore,* 22 Cal.2d 269, 273 [138 P.2d 673, 147 A.L.R. 1111], as a conditional right—a privilege—and at most an offer enabling the taxpayer to regain title to the property, which offer could be revoked upon sale of the property by the state at any time before acceptance. The court stated: "It is also contended that the right to redeem after the property has been deeded to the state but before it has been sold by the state is a property right, and that the legislation in question deprives the property owner of that right without due process of law. This contention takes no account of the distinction between the absolute right to redeem within the fixed period of five years from the date of sale to the state, and the conditional right to redeem once the property has been deeded to the state if the state does not sell the property. The deed to the state upon the expiration of the five-year period conveyed absolute title to the property free of any incumbrance except liens for certain taxes. (Pol. Code, § 3787; Rev. & Tax. Code, § 3520.) Upon execution of the deed the property owner forfeited all rights in the property except the privilege of redeeming it at any time before the state disposed of it. [Citations.] The property owner thereafter had at most an offer enabling him to retain title to the property, which could be revoked by the state at any time before acceptance. . . ." These principles are firmly established in later cases construing the statutes involved. (*People* v. *Lucas,* 55 Cal.2d 564, 568 [11 Cal.Rptr. 745, 360 P.2d 321]; *Peterson* v. *Johnson,* 39 Cal.2d 745, 748 [249 P.2d 17]; *People* v. *Maxfield,* 30 Cal.2d 485, 487 [183 P.2d 897]; *Peninsula Properties Co.* v. *County of Santa Cruz,* 106 Cal.App.2d 669, 681 [235 P.2d 635]; *Merchants Finance Corp.* v. *Kuchel,* 83 Cal.App.2d 579, 581-582 [189 P.2d 513].)

■ In the instant case Brinker was not the *owner* of the subject real property at the time of his death; the trial court properly so found. As indicated, the State of California, upon the tax deed being issued to it, acquired absolute title to the property, together with the right to possession, rents and

---

lants' position to be upheld by this Court, it would so seriously impair titles cast by tax deed that no one could purchase tax deeded property with any degree of certainty, and such title would be subject to upset even after the statutory period of limitations specified in section 3809, Revenue and Taxation Code, had expired.''

profits therefrom, and the right to dispose of the property as any other owner of real property. (*Mercury Herald Co.* v. *Moore, supra*, 22 Cal.2d 269, 273; *People* v. *Lucas, supra*, 55 Cal.2d 564, 568; *People* v. *Maxfield, supra*, 30 Cal.2d 485, 487.) The property was not an asset of his estate; the probate court was without jurisdiction over it; and any order of distribution purporting to distribute it to an heir would not be binding on the state or its purchaser. (*Estate of Dabney*, 37 Cal.2d 672, 676-677 [234 P.2d 962].) The heirs did not take Brinker's privilege of redemption as bona fide purchasers, nor did they acquire any greater rights than decedent himself had. "They hold the property inherited from him precisely as he held it, subject to the same conditions and equities that attached to it in his hands." (*Carlson* v. *Carlson*, 124 Cal. App. 207, 210 [12 P.2d 165].) They took Brinker's privilege of redemption, as he had held it, at all times subject to section 3807 which provided that it was terminated *by operation of law* whenever the state, in its discretion, chose to dispose of the property.

█ " 'The Legislature has full control over the sale of property belonging to the State, which it may direct sold, and to regulate or change at any time the method of its disposition.' " (*Mercury Herald Co.* v. *Moore, supra*, 22 Cal.2d 269, 273.) █ The state's deed to San Francisco, executed pursuant to an agreement as provided in Revenue and Taxation Code sections 3791-3814, and approved by the State Controller who is the custodian of tax-deeded property (§§ 3515-3516, 3617, 3651, 3700, 3795), was a final disposition of the subject property. By operation of law the privilege of redemption was terminated. (§ 3807.)

█ It seems rather clear that the enactment of Probate Code section 300 discloses no legislative requirement of court consent, with its attending litigation, before such stale and flimsy claims of deceased delinquent taxpayers could be divested.

The judgment is affirmed. The purported appeal from the order of November 30, 1966, a nonappealable order, is dismissed.

Molinari, P. J., and Sims, J., concurred.

A petition for a rehearing was denied July 18, 1969, and appellants' petition for a hearing by the Supreme Court was denied August 20, 1969.