**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leonard R. SHEWFELT and Imperial County Land Company, Defendants-Appellants.**

No. 71-2154.

United States Court of Appeals,
Ninth Circuit.

Feb. 9, 1972.

Rehearing Denied April 24, 1972.

Certiorari Denied May 22, 1972.
See 92 S.Ct. 2042.

James G. Ehlers (argued), Oscar F. Irwin, of Hillyer & Irwin, San Diego, Cal., for defendants-appellants.

James W. Branningan, Dept. of Justice (argued), Harry Steward, U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before WRIGHT and TRASK, Circuit Judges, and BYRNE,* District Judge.

BYRNE, District Judge:

At a jury trial, appellants Shewfelt and Imperial County Land Company (hereinafter Imperial Land) were found guilty of 14 counts of mail fraud, violations of Title 18, United States Code, Section 1341. Shewfelt was sentenced to 14 two-year prison terms, the sentences to run concurrently. Imperial Land was fined $1,000 for each count upon which it was convicted for a total of $14,000. Finding against appellants on all issues raised, we affirm their convictions.

Viewing, as we must, the evidence in the light most favorable to the government, the following can be unraveled from this seemingly never-ending spool of trickery and deceit. The real property in issue is desert land located east of the Salton Sea in Imperial County, California. In the 1920s these lands were sold by a subsidiary of the Southern Pacific Railroad Company (the United States had granted these lands to the Southern Pacific at the turn of the century) to speculators who promptly sold them to the general public in sections of approximately ten acres each. In 1930 and 1931, Imperial County removed large areas of these lands from its tax rolls because the administrative cost of their taxation was greater than the income received therefrom. Thirty years later, in 1960, the tax rolls were reinstated. Largely due to deaths, sales and movings, most of the tax bills were returned, resulting in the tax delinquencies of such lands. Pursuant to California law,[1] the delinquent lands in 1966 were deeded to the state with the former owners or their successors in interest retaining a right to pay the delinquent taxes and thus redeem the property [2]

---

* Honorable William M. Byrne, Senior United States District Judge, Central District of California, sitting by designation.

1. California Rev. & Tax.Code, § 3511.

2. California Rev. & Tax.Code, § 4101.

any time prior to the disposition thereof by way of public auction.

In late 1966, Imperial Land, through its two shareholders, Shewfelt, a long time land speculator well versed in the intricacies of conducting title searches, and one Henry Hoffman,[3] instituted a systematic effort to determine (1) which of the lands in question were delinquent in their taxes and (2) the names and whereabouts of the last record owners or their heirs, in the event the last record owner had died. Having garnered this information from a host of sources (e.g. real property records of title companies, the Department of Motor Vehicles, the Bureau of Vital Statistics, as well as the files of funeral directors), the appellants stood ready to utilize this data to serve their devious ends.

Shewfelt met with attorney Cyril Walton for the purpose of filing a quiet title suit as to all of this "delinquent" land on behalf of Imperial Land. To be named as defendants were the last owners of record. Walton convinced Shewfelt that it would be more financially responsible "to file on a few parcels in separate actions." Thereafter, complaints verified by Shewfelt and Hoffman were filed in Imperial County Superior Court. These complaints were identical in format, each alleging that Imperial Land was the owner in fee simple of the real property described. In fact at the time these suits were filed, Imperial Land had no interest in these lands.

Rather than personally serve the named defendants as required by the then existing state law, Shewfelt caused the complaints to be mailed. Included in the mailing was a form letter Shewfelt had prepared on stationery bearing the heading "Pacific Land Title Research Company," a pseudonym for Imperial Land apparently used to convey the impression of authenticity by invoking the aura of a title company. The import of the letter was that Imperial Land held

tax title, that the defendant had no interest in the property and that a costly lawsuit could be avoided and a nominal sum received (from $25 to $100), if the disclaimer which had been provided were executed.

From July 3, 1967, until the end of that year, eight such complaints were filed. Through the use of executed disclaimers, Imperial Land took judgment in two of the quiet title actions it had filed. Those defendants that filed an answer to the complaint had the action against them dismissed, often with prejudice. One defendant received a stipulated judgment in his favor.

In 1968, appellants secured the services of a new attorney, one Herman Ablon, who readily agreed to file quiet title actions in the name of Imperial Land even though he knew his clients had no interest at all "in most" of the real property that was the subject of the complaints he filed. Of the six complaints filed that year, Imperial Land took two judgments as a result of executed disclaimers.

The district court instructed the jury that a finding of untrue representations made in good faith would require rendering a verdict of acquittal. Although requested to do so, the court refused to charge the jury that reliance on the advice of counsel is an element to be considered in determining whether Imperial Land and Shewfelt had acted in good faith or with fraudulent intent. Claiming to have never been advised as to any impropriety with regard to the lawsuits in question, appellants maintain this refusal constitutes prejudicial error.

The position advanced by the appellants is embedded in the well-established legal postulate that a "defendant in a criminal case is entitled to have the jury consider any theory of the defense which is supported by law and which has some foundation in the evidence, however tenuous." United States v.

---

3. The prosecution of Hoffman, who had been indicted as a co-defendant, was severed from that of appellants upon motion of the government. The last information made available to the court was that Hoffman's case had yet to come to trial.

Grimes, 413 F.2d 1376, 1378 (7th Cir. 1969); Charron v. United States, 412 F.2d 657 (9th Cir. 1969); Baker v. United States, 310 F.2d 924 (9th Cir. 1962), cert. denied, 372 U.S. 954, 83 S. Ct. 952, 9 L.Ed.2d 978 (1963). A seemingly extreme illustration of a court's willingness to invoke this settled rule is United States v. Diamond, 430 F.2d 688, 694 (5th Cir. 1970), a case upon which the appellants rely. There, advertising copy promoting the sale of Arizona land was approved by the defendants' attorney. In compliance with New York law, the approved copy which had been created specially for that state, was free of any reference as to the availability of utilities. Although the tenuity of the evidence was acknowledged, it was deemed sufficient "to warrant an instruction in proper form as to reliance upon advice of counsel as a defense" because the contents of the defendants' promotional brochures served as the bases of the mail fraud charges brought against them.

■ In comparison to the facts of the instant case, the circumstances in *Diamond* must be viewed as compelling. Here, the evidence beyond question indicates that appellants retained counsel to insure the success of their mendacious scheme, not to secure legal advice. The attorneys in question merely implemented in the most expeditious manner the plan concocted by their clients which preyed upon unsuspecting holders of interest in real property. It is noteworthy that it was Shewfelt who wrote the first form letter that was mailed to the initial group of defendants. The acknowledgment by Attorney Ablon, who "improved" Shewfelt's form letter, that he knew Imperial Land was without any interest in "most" of the lands which were the subjects of the complaints he filed in its behalf, underscores the fact that facilitation of appellants' scheme was the essence of the attorney-client relationship in controversy. Thus, here, unlike in *Diamond*, the attorneys did not unwittingly lead their clients down the road of crime. In this case, the clients

acted as engineers who had sent out their workmen to remove any existing impediments. Under such circumstances it is irrelevant that appellants were never told of their impropriety. Legal assurance was not sought because acting within the framework of the law was not the reason appellants elected to deal with members of the Bar. Cf. United States v. Phillips, 217 F.2d 435 (7th Cir. 1954), where the trial court's refusal to give a requested instruction as to advice of counsel was deemed reversible error because the evidence indicated that the defendant *had* acted pursuant to his attorney's advice when he reported his income in the manner which led to his indictment.

The trial court's rejection of another jury instruction propounded by the appellants is the subject of an additional assault upon the charge read to the jury. Specifically, appellants maintain that because the California courts have viewed the right of redemption as "nothing more than a personal privilege," the jury should have been instructed that the act of executing the disclaimers in question was wholly without any legal consequence. Absent the transfer of a proprietary interest, appellants assert the charges of mail fraud flowing from this so-called "scheme" were entirely baseless. Had the jury been so instructed argue the appellants, a verdict of guilty would never have been returned.

■ Our reading of California law requires that we too reject the position advanced by the appellants. The redemption privilege which has been deemed "personal" enables the former owner or his *successor in interest* to divest the state of its title in the deeded property by paying all delinquent taxes prior to any authorized disposition. Glunt v. City and County of San Francisco, 274 Cal.App.2d 269, 79 Cal.Rptr. 513 (1969); Potter v. County of Los Angeles, 251 Cal.App.2d 280, 59 Cal. Rptr. 335 (1967). The "personal" limitation placed upon his privilege bars the transfer of title in the tax-deeded property to a "total stranger" whose only

connection with the land is his payment of the outstanding taxes. People v. Lucas, 55 Cal.2d 564, 11 Cal.Rptr. 745 360 P.2d 321 (1961); Mercury Herald Co. v. Moore, 22 Cal.2d 269, 138 P.2d 673 (1943). As can be readily seen, with regard to real property which had been deeded to the state because of a delinquency in the payment of taxes, the holders of the privilege of redemption did indeed have an interest that was of value. If that were not true, it is open to question why experienced land speculators would spend months conducting careful title searches and orchestrating the institution of numerous quiet title actions.

The immediate goal of the elaborate plan devised by the appellants was to succeed to the interest held by the persons who were made defendants in the groundless lawsuits. In order to facilitate this goal, the appellants intentionally misrepresented to their unwitting victims that the victims had no interest in these lands and that execution of the disclaimers in question was the only alternative to financially draining lawsuits. In short, the disclaimers were used as a means to deny the holders of the privilege, the opportunity to obtain clear title to the real property. The consequences thereof would be the appellants taking quiet title judgments by way of the executed disclaimers, thus enabling them to pay the tax deficiencies as successors in interest, not as "total strangers." Under such circumstances, we find no error in the trial court's refusal to charge the jury as requested by the appellants.

Over appellants' timely objection, attorneys Walton and Ablon were permitted to testify about communications with Shewfelt which clearly portrayed this appellant as the instigator of a "game plan" which if pursued with determination, would surely outwit unsuspecting victims of their interests in the lands now in issue. On appeal, appellants renew their contention that because these communications were confidential in nature, it was a "serious violation" of the attorney-client privilege, ergo prejudicial error to permit their disclosure.

The only impropriety relating to admission of these communications is the substance thereof. As noted, it is clear that the thrust of these attorney-client conversations was to effectuate a plan of fraud. Conversations of this sort are not accorded the sanctity of being deemed privileged. Petition of Sawyer, 229 F.2d 805 (7th Cir. 1956), cert. denied, Sawyer v. Barczak, 351 U.S. 966, 76 S.Ct. 1025, 100 L.Ed. 1486 (1956); Pollock v. United States, 202 F.2d 281 (5th Cir. 1953), cert. denied, 345 U.S. 993, 73 S.Ct. 1133, 97 L.Ed. 1401 (1953); United States v. Bob, 106 F.2d 37 (2d Cir. 1939), cert. denied 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493 (1939). Nevertheless, before the privileged status of these communications can be lifted, the government must first establish a prima facie case of fraud independently of the said communications. Union Camp Corp. v. Lewis, 385 F.2d 143 (4th Cir. 1967); United States v. Bob, supra. Herein, as shown by the evidence set forth below, prior to the testimony of attorney Walton, the government had adduced substantial evidence proving falsehoods in the complaints and mailings which served as the bases of the charges brought against the appellants.

Pacific Title, over the signature "Leonard R. Shewfelt," had mailed letters to the record holders of interest enclosing summonses and quiet title complaints bearing captions showing plaintiff to be Imperial Land. The complaints were verified by Shewfelt and Hoffman and listed the law firms in which Walton and Ablon were partners. The letters, which stated that properties in which the addressees claimed an interest had been tax deeded to the State of California, implied that Imperial Land had acquired tax title and therefore paramount title to any interest of the addressees. The letters indicated

that if the addressees signed the enclosed disclaimers, they could avoid a lengthy lawsuit, as well as receive a nominal compensation in return. Also, the government had established that as to two of the complaints (one filed by Walton, the other by Ablon) Imperial Land had no interest in the said properties, despite verifications to the contrary.[4]

Since the propriety of Ablon's testimony is predicated upon the same "independent" evidence (indeed, the government's case had been enhanced by the testimony of Walton and others prior to Ablon being called as a witness) we also sustain its admission.

In what can only be viewed as at best a *pro forma* gesture, appellants claim they have incurred substantial prejudice by the trial court's refusal to substitute counsel and to grant a continuance. The court refused on the ground that these motions were advanced solely to delay the trial proceedings. A panel of this court denied appellants' motion for a writ of mandamus ordering the substitution of counsel. Although they claim to have been prejudiced by the failure to substitute, appellants are unable to allude to even one example which might substantiate their claim. This is readily explained by the fact that able counsel (the very attorney who was the subject of the substitution motion) represented the appellants in so proficient a manner that he was the recipient of congratulatory praise from the trial judge.

Affirmed.

4. Appellants maintain that the government failed to meet its burden because, as they see it, "There was no evidence, prior to the testimony of Attorney Walton, that Shewfelt knowingly and consciously misrepresented that Imperial County Land Company had a fee interest in the property involved in each respective quiet title complaint." Implicit in this position is the view that the government must proffer direct evidence to establish the wilful misrepresentation. Such a view is not shared by the courts, for it is well settled that the element of wilful intent "may be inferred from the activities of the parties involved." Blachly v. United States, 380 F.2d 665, 676, (5th Cir. 1967); Henderson v. United States, 202 F.2d 400 (6th Cir. 1953). As can be readily seen, there was sufficient evidence in the instant case to make such an inference prior to the calling of attorney Walton to the witness stand.