**UNITED STATES of America, Plaintiff,**

v.

**Jennifer J. KING, Defendant.**

**No. CR 81–366 MRP.**

United States District Court,
C. D. California.

March 15, 1982.

---

Andrea Sheridan Ordin, U. S. Atty. by Richard E. Drooyan, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Michael J. Lightfoot, Robert M. Talcott, Talcott, Vandevelde & Woehrle, Los Angeles, Cal., for defendant.

## OPINION

PFAELZER, District Judge.

Defendant, an attorney, is charged with obstructing justice by counseling an individual to lie to the grand jury that was investigating charges against the defendant's clients. The individual in question was actually a government informant who tape-recorded the crucial conversation with the defendant. The tape recording of the conversation and the testimony of the informant constitute the principal evidence against the defendant. In the motion before the court, the defendant moves to suppress all evidence of the conversation on the

grounds that (1) the conversation is protected by the attorney-client privilege, (2) the government, through its use of an informant, illegally interfered with the defendant's representation of her clients in violation of the Sixth Amendment, (3) the government intruded into the attorney-client setting without first obtaining a warrant, in violation of the Fourth Amendment, and (4) neither party to the conversation "consented" to be recorded, as required by 18 U.S.C. § 2511(2)(c).

## I. FACTS

In early 1981, the government commenced an investigation into the business dealings of Harold J. Smith ("Smith") and his two corporations, Muhammad Ali Amateur Sports, Inc., and Muhammed Ali Professional Sports, Inc. The investigation focused on Smith's banking transactions with Wells Fargo Bank ("Bank"). In late February 1981, Smith retained the defendant as an attorney to represent him and his corporations in the federal criminal investigation as well as in pending state civil proceedings instituted by the Bank. Smith's two corporations ceased operation in February 1981 in the wake of the investigation.

In preparation of the defense of her clients, the defendant attended a series of meetings at Lake Tahoe, Nevada over the February 28–March 1, 1981 weekend to discuss the facts of the case. Several persons attended the meetings, including Smith and his personal secretary, Terisa Key ("Key"). During the meetings, documents relating to Smith's transactions with the Bank were shown to the defendant and the contents of the documents were discussed by defendant and Key. At the conclusion of the meetings, Smith delivered certain of these documents to the defendant and she retained them. The parties sharply dispute what documents were shown to defendant at Lake Tahoe and what documents were later delivered to her there. On March 9, 1981, the defendant received a subpoena from the grand jury calling for her as the custodian of records to produce certain of her clients' documents. Two days later, she appeared before the grand jury with a number of documents, among which were two sets of documents she had received at the Lake Tahoe meetings. In response to the prosecutor's questions, the defendant stated to the grand jury that, at the time she received those sets of documents, she did not see or receive any other documents falling within the scope of the subpoena.

In her representation, the defendant had frequent contact with Key, who was a principal employee of defendant's corporate clients as well as Smith's personal secretary.[1] On March 4, 1981, Key agreed, in exchange for a grant of immunity, to provide information to the government concerning its investigation of Smith and his corporations. Key informed the defendant and Smith's other attorneys that she was cooperating with the Federal Bureau of Investigation ("FBI"), but she also agreed to keep the defense team informed of her interviews with that agency. In late March, Key further agreed to contact the defense team when she received a grand jury subpoena so that they could "go over it" with her.

While cooperating with the government, Key informed the FBI that the defendant had previously told her to lie to federal investigators. In an effort to corroborate this report, the government decided to use Key to tape-record conversations with the defendant. The investigators did not, however, seek a warrant for that purpose. In furtherance of this plan, on April 6, 1981, two days after Smith had been arrested for making a false passport application, Key called the defendant, told the defendant that she had received a subpoena to appear before the grand jury, and set up a meeting for the following day to discuss the subpoena. On April 7, Key, with a recording device concealed on her person, visited the defendant at her office under instructions from the government not to ask the defendant about Smith's defense. At the meeting,

---

1. In her work for the corporations, Key acted as receptionist for the office and was responsible for maintaining the records that related to the corporate checking accounts with the Bank.

the defendant and Key generally discussed Key's forthcoming grand jury testimony, but, during part of the conversation, defendant focused on her own prior appearance before the grand jury. The defendant expressed concern that she might be indicted on the basis of her statements to the grand jury concerning what documents she had seen at Lake Tahoe. It is the government's position that this concern led the defendant to advise Key to lie to the grand jury about what documents the defendant had seen at the Lake Tahoe meeting.[2] The defendant denies telling Key to lie and claims that she was unaware that her conversation with Key was being recorded. She did know, however, that Key was a government informant and that Key had been granted immunity from prosecution. Thus, as the defendant put it, "we didn't trust her."

On April 8, 1981, the grand jury handed down a four-count indictment against the defendant, charging in Count 4 that she had obstructed justice in violation of 18 U.S.C. § 1503 by advising Key on April 7, 1981 to lie to the grand jury.[3] After trial on all counts, the jury deadlocked on Count 4, and the court declared a mistrial as to that count. The other three counts resulted in judgments of acquittal,[4] leaving only Count 4 for retrial. Defendant's motion to suppress is before the court preliminary to the second trial.

2. The substance of the government's case against the defendant concerns her alleged advice to Key that she should lie about the documents seen at Tahoe. However, the government further contends that the defendant counseled Key to lie about two other matters: (1) the removal of various records from the corporations' office on or about January 23, 1981 and the subsequent disposition of those records; and (2) the postponement of an audit of corporate records.

3. Count 1 of the indictment charged the defendant with obstructing justice in violation of 18 U.S.C. § 1503 in that she counseled Key to lie on March 1, 1981. Count 2 charged her with committing perjury before the grand jury on March 11, 1981, in violation of 18 U.S.C. § 1623. The third count, another obstruction charge, alleged that the defendant told Key to lie on March 13, 1981.

## II. DISCUSSION

Defendant's motion raises substantial questions concerning the scope of the attorney-client privilege, the need for confidentiality in the attorney-client relationship, and the circumstances under which the government should be allowed to interfere with that relationship in enforcing the criminal law. For the reasons set forth in the discussion that follows, the court has concluded that the motion should be denied.

### A. Attorney-Client Privilege

Defendant asserts the attorney-client privilege on behalf of her clients, Smith and his corporations, and argues that the privilege requires suppression of all evidence of the April 7, 1981 conversation.[5]

As a threshold matter, the government contends that the defendant lacks standing to assert the privilege. With respect to the standing issue, it is clear that the defendant "must establish the fact of an attorney-client relationship [before she can invoke the privilege]." *In re Walsh*, 623 F.2d 489, 493 (7th Cir.), *cert. denied*, 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980). In this case, the government is compelled to concede that at the time of the conversation the defendant was the attorney for Smith and his corporations. Indeed, the first trial proceeded on the premise that the meeting on April 7 con-

4. The jury acquitted the defendant on the obstruction counts, Counts 1 and 3, and deadlocked on the perjury charge in Count 2. The court declared a mistrial as to Count 2 as well as Count 4, and on September 28, 1981, ruled that defendant was entitled to a judgment of acquittal on Count 2 since the evidence was insufficient as a matter of law to support a conviction.

5. Although the government recorded the entire conversation between the defendant and Key, the tape recording used at the first trial omitted the defendant's opening remark to Key. References in this opinion to the April 7 conversation are to that recording and to its corresponding transcript.

cerned the criminal investigation of defendant's clients and that it involved the defendant, as counsel for Smith and his corporations, and Key, as a former employee of defendant's clients. Unquestionably, an attorney-client relationship existed here since the conversation related to a criminal investigation of the clients. *Upjohn v. United States*, 449 U.S. 383, 394, 101 S.Ct. 677, 685, 66 L.Ed.2d 584 (1981). Further, the relationship existed even though Key was not an employee of Smith or the corporations at the time of the conversation. *In re Coordinated Pretrial Proceedings In Petroleum Products Antitrust Litigation*, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981) (applying *Upjohn*), *cert. denied*, ── U.S. ──, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982).[6]

 Since "it is universally accepted that the attorney-client privilege may be raised by the attorney," *Fisher v. United States*, 425 U.S. 391, 402 n.8, 96 S.Ct. 1569, 1577 n.8, 48 L.Ed.2d 39 (1976), the defendant may assert the privilege in this case. *See* Proposed Rule 503(c), Fed.R.Evid., Advisory Committee Notes, *reprinted in* 2 J. Weinstein, Evidence 503-1, at 503-6 to 503-7 (1981) (attorney has obligation to invoke privilege for client);[7] ABA Code of Professional Responsibility EC 4-4 (1980) (same). The fact that defendant's clients

are not parties to the instant proceeding is irrelevant in deciding the question of standing, *see* C. McCormick, Evidence § 92, at 192 (2d ed. 1972), and, in any event, Smith has asserted the privilege directly by filing an affidavit with the court. The government's position on the standing issue is therefore without merit.

Although the defendant has standing to assert the privilege, she must carry the burden of establishing that the privilege extends to the conversation at issue here. *Weil v. Investment/Indicators, Research & Management, Inc.*, 647 F.2d 18, 25 (9th Cir. 1981).[8] She has failed to carry that burden for several reasons.

 First, exclusion of the evidence in question would not serve the purpose of the privilege. The privilege plays an important role in the administration of justice; by ensuring the continued secrecy of attorney-client communications made in confidence, the privilege encourages uninhibited discussion between the attorney and client. *See Upjohn, supra*, 449 U.S. at 389, 101 S.Ct. at 682. Yet, "[b]ecause it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Weil*, 647 F.2d at 24. It is therefore well established that the attorney-client privilege "applies only where necessary to achieve its

---

**6.** In addition to her *Upjohn* argument, defendant also contends that an attorney-client relationship existed because her clients and Key had agreed to pool information about Key's grand jury appearance. *See United States v. McPartlin*, 595 F.2d 1321, 1335–37 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *Hunydee v. United States*, 355 F.2d 183 (9th Cir. 1965); *Continental Oil Co. v. United States*, 330 F.2d 347 (9th Cir. 1964) (disapproved in part on other grounds in *Los Angeles v. Williams*, 438 F.2d 522 (9th Cir. 1971)); 2 J. Weinstein, Evidence ¶ 503(b)[06], at 503–61 (1981). Because the court concludes that *Upjohn* applies to the April 7 conversation, it need not reach the issue of whether the "pooling" theory applies. It should be noted, however, that application of the pooling theory would not alter the court's disposition of defendant's motion.

**7.** In the absence of a relevant Supreme Court rule, federal statute, or federal constitutional provision, questions of privilege are governed by "the principles of the common law as they

may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501. Although Congress did not adopt the specific details of the proposed federal rule concerning the attorney-client privilege (Rule 503), "the recommendations of the Advisory Committee, approved by the Supreme Court, are a useful guide to the federal courts in their development of a common law of evidence." *United States v. McPartlin*, 595 F.2d 1321, 1337 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

**8.** In arguing that the privilege applies, defendant emphasizes that she took steps during the conversation to ensure the secrecy of the communications, for example, by asking a third person to leave the room and by telling Key that the privilege would apply to their discussion. While such conduct may indeed be important in preserving the privilege, it is not controlling on the court. Defendant's own legal conclusions about the applicability of the privilege do not affect this court's independent examination of the issue.

purpose." *Fisher v. United States, supra,* 425 U.S. at 403, 96 S.Ct. at 1577. Since the privilege ensures the secrecy of the attorney-client communication, "it is vital to a claim of privilege that the communication have been made ... in confidence." *United States v. Pipkins,* 528 F.2d 559, 563 (5th Cir.), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976); *accord* 8 J. Wigmore, Evidence § 2311 (McNaughton rev. 1961) [hereinafter Wigmore]. In the case at bar, the conversation lacked the requisite confidentiality. The defendant knew that Key was cooperating with the government, that she was providing the FBI with information about Smith and his corporations, and that she had been granted immunity from prosecution. It was also known that Key had obtained her own attorney.[9] These facts were sufficient to put the defendant on notice that her remarks were not being made to a trusted advisor of her clients, that is, in a confidential setting.[10] A review of the testimony at the first trial clearly demonstrates that if Key had once been a trusted advisor and defendant had considered her as such, Key did not occupy that status at the time of the conversation nor did defendant think she did.[11] Accordingly, whatever attempts the defendant may have made to confer the technical legal status of trusted advisor on Key during the crucial conversation, the requisite confidentiality was in fact lacking.

Second, the application of the privilege on these facts would undermine the purpose of the privilege in a different respect. Although the defendant invokes the privilege to exclude her own statements rather than

---

**9.** In arranging the April 7 meeting, Key informed the defendant that because of her own financial situation, she could not afford to seek advice from her attorney about the grand jury appearance. In the motion before the court, the defendant does not contend that she was acting as Key's attorney at the time of the conversation, apparently because Key, as the holder of the privilege, would be deemed to have waived it.

**10.** The presence of the client's trusted advisors or agents during the conversation does not render the communication any less confidential. *See Mead Data Central, Inc. v. United States Department of the Air Force,* 566 F.2d 242, 253 n.24 (D.C.Cir.1977); *United States v. Andreadis,* 234 F.Supp. 341, 345 & n.3 (E.D.N.Y.1964). However, the trusted advisor must hold that position at the time of the communication in question. *United States v. Landof,* 591 F.2d 36, 39 (9th Cir. 1978). This is not to say that Key had to be an *employee* of defendant's clients on April 7, for the court has already determined, consistent with the *Upjohn* decision, that the attorney-client relationship covered the conversation despite Key's loss of employment. Similarly, the termination of the employment relationship did not end Key's status as a trusted advisor. Her decision to assist the government, however, did.

**11.** On direct examination, the defendant testified as follows:

Q. All right. Do you recall any meetings where the subject of Terisa Key being an informant for the government came up with ... [an attorney at your firm]?
A. I know we told Harold [Smith] that she was cooperating with the FBI ....

Q. Well, was there a point in time where you discussed or someone discussed with you that Teri was now obviously hostile?
A. Well, after my meeting with her on March 13th, ... I obviously told Mr. Smith that there may be some potential problems.
 . . . .
Q. Miss King, you were aware on April 6th or 7th, were you not, that she was talking to the FBI?
A. Oh yes. I had known for some time.
 . . . .
Q. Why didn't you discuss with her before April 6th or 7th what her testimony [before the grand jury] might be?
A. Because, number one, we didn't trust her. No one was talking to the woman ....
 . . . .
Q. Miss King, you knew this woman was an informant, correct?
A. That is correct.
Q. Did you not have an opinion as to whether she might not be wearing a tape recorder when she came to talk to you?
A. No, I didn't have an opinion as to that.
Q. Did the thought even flash through your mind?
A. It might have. Yeah, I think it perhaps did flash through my mind.
Q. As you spoke to her, you didn't believe it to be the case, did you?
A. No.
 . . . .
Q. Were you concerned about Teri being a part of what you perceived, I take it, as some sort of a conspiracy or effort to get you in trouble?
A. Yes.
Transcript of testimony of Jennifer King, pp. 97–98, 100, 101, 103–04, 106.

those of her clients, it is well established that the privilege extends to the advice of the attorney as well as the communications of the client. *United States v. Ramirez*, 608 F.2d 1261, 1268 n.12 (9th Cir. 1979); *In re Fischel*, 557 F.2d 209, 211 (9th Cir. 1977). However, protection is afforded the attorney's advice on the narrow ground that "[o]rdinarily the compelled disclosure of an attorney's communications or advice to the client will effectively reveal the substance of the client's confidential communication to the attorney." *Id.* at 211. Thus, where the attorney's statements can be made known without revealing the confidences of the client, the purpose of the privilege is not frustrated by requiring disclosure of the attorney's statements. An attorney's relationship with her clients is not a talisman for applying the privilege to every conversation held within the confines of her office. The privilege is not "draped around all occurrences and conversations which have any bearing, direct or indirect, upon the relationship of the attorney with his client." *United States v. Goldfarb*, 328 F.2d 280, 281–82 (6th Cir.), *cert. denied*, 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964). "Once the attorney-client relationship is established, inquiry will focus upon the nature of the communication [in determining whether the privilege attaches]." *In re Walsh, supra*, 623 F.2d at 494. In this case, inquiry into the nature of the communication indicates that, with the possible exception of two statements made by defendant, the April 7 conversation did not involve any confidential information provided to the defendant by her clients.[12] Nor did it involve any advice for their benefit. The substance of the conversation was devoted not to the interests of defendant's clients, but to her own selfish motive—her desire to avoid being indicted for perjury. There is no evidence that the interests of the defendant's clients in any way dictated defendant's instructions to Key with respect to the grand jury. Thus, because the April 7 conversation can be disclosed without revealing any confidential communications of defendant's clients or any advice rendered on their behalf, the privilege is not applicable.

Third, the privilege is not available because the defendant invokes it to shield her own illegal communications. "[T]he attorney-client privilege is not to be used as a cloak for illegal or fraudulent behavior." *United States v. Hodge and Zweig*, 548 F.2d 1347, 1354 (9th Cir. 1977); *accord, In re September 1975 Grand Jury Term*, 532 F.2d 734, 737 (10th Cir. 1976). Thus, a client cannot invoke the privilege where the desired legal advice relates not to the client's past wrongdoing, but to his intended or continuing criminal conduct. *Hodge and Zweig*, 548 F.2d at 1354–55. Similarly, an attorney cannot invoke the privilege to exclude evidence of her illegal or fraudulent advice even if the advice was intended to benefit her client. *United States v. Kahn*, 366 F.2d 259 (2d Cir.), *cert. denied*, 385 U.S. 948, 87 S.Ct. 321, 17 L.Ed.2d 226 (1966). And if the attorney cannot invoke it to serve her clients' interest, it follows that she certainly cannot invoke it to serve her own.

Assuming that the privilege exists and that it is to be denied on the ground of the crime/fraud exception, a prima facie case must be established that the communication in question was indeed in furtherance of a crime or fraud. *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933); *United States v. Friedman*, 445 F.2d 1076, 1086 (9th Cir.) (applying *Clark*), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). Based on the tape recording of the conversation, which the court heard at the first trial, and a subsequent examination of the transcript of the conversation *in camera*, the court has no difficulty finding that a prima facie case has been

---

12. The transcript of the April 7 conversation includes two references by the defendant to statements purportedly made to her by Smith, *see* Transcript at 78–79, neither of which is relevant to the obstruction count pending against defendant. Without deciding whether Smith actually made the statements, the court finds that, consistent with the rationale for protecting the attorney's advice to her client, the statements should be deleted for purposes of the second trial.

made. However, defendant cites *United States v. Shewfelt*, 455 F.2d 836, 840 (9th Cir.), *cert. denied*, 406 U.S. 944, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972), for the proposition that the prima facie case must be based on evidence *independent* of the privileged conversation. *Shewfelt* does appear to set forth such an "independency test" on the particular facts of that case. Nevertheless, for several reasons, the court cannot apply *Shewfelt* in the factual context presented here.

Preliminarily it should be noted that the independency test set forth in *Shewfelt* does not now appear to be the law in the Ninth Circuit. In *United States v. Friedman*, 445 F.2d 1076 (9th Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971), a case decided one year before *Shewfelt*, the Ninth Circuit relied primarily on the privileged communication itself to determine whether the crime/fraud exception applied. *See id.* at 1085–86. Significantly, the *Friedman* application of the crime/fraud exception was recently reaffirmed by the Ninth Circuit in *United States v. Hodge and Zweig*, 548 F.2d 1347, 1354–55 (9th Cir. 1977), thereby seriously eroding *Shewfelt* as authority. In fact, in the ten years since it was decided, *Shewfelt* has been cited only once for its independency requirement, and that citation, by the Eighth Circuit, was with disapproval. *See In re Berkley & Co.*, 629 F.2d 548, 553 n.9 (8th Cir. 1980) ("The cases relied on in *Shewfelt* to support this proposition [the independency test] simply state the requirement of a prima facie case and do not support the independent evidence restriction.") Obviously, in cases of this kind, an *in camera* inspection of the privileged communication should be made in order to determine that the communication was in furtherance of a crime or fraud. If the court is not satisfied after such an examination, it

should require additional, independent evidence to establish the requisite prima facie case. The Seventh and Eighth Circuits have discussed the use of *in camera* inspection as applied to the crime/fraud exception, and both have approved its use in determining whether the privilege attaches. *See In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 59–61 (7th Cir. 1980); *In re Berkley & Co.*, 629 F.2d 548, 553 & n.9 (8th Cir. 1980).

Even assuming that the independency test must be applied in some cases, it is clear that such a test should not apply to the facts presented here. In *Shewfelt*, the privileged communications were not illegal in themselves but were corroborative of other evidence establishing that the defendants had committed mail fraud. In the case before the court, however, it is the privileged conversation itself that is alleged to constitute the crime. In this factual context, no independent evidence usually exists that the attorney is obstructing justice; the only evidence of the crime is the conversation itself. Indeed, since the illegal advice is usually given in the attorney-client setting, applying *Shewfelt* to such cases would, in most instances, simply serve to insulate dishonest attorneys from prosecution for obstruction of justice. The court refuses to reach such a result.

Finally, even if the independency test survives *Hodge and Zweig* and applies to this case, it is clear that there is evidence independent of the April 7 conversation to establish a prima facie case of criminal activity. That evidence is found in Key's reports to the FBI that, prior to April 7, the defendant had told her to lie to federal investigators.[13] Thus, the crime/fraud exception to the privilege should apply in this case.

---

**13.** These reports to the FBI gave rise to Counts 1 and 3 of the indictment. *See* note 3 *supra*. Although the jury acquitted the defendant on those counts, there was sufficient evidence as to each charge to warrant submitting them to the jury. Thus, while the defendant's earlier consultations with Key did not satisfy the reasonable doubt standard, they did establish a prima facie case that the defendant had told Key to lie prior to the April 7 meeting. Here, for purposes of satisfying *Shewfelt*, the court simply holds that the prior consultations established a prima facie case that the April 7 conversation was intended to further the defendant's ongoing attempts to cause Key to lie.

As a fourth and final ground for denying the privilege, the court finds that it has been waived. At her first trial, neither defendant nor Smith invoked the privilege to exclude evidence of the conversation.[14] No objection was made when the tape recording was played in open court or when Key testified about the conversation, and the privilege was not asserted by way of motion.[15] Moreover, the defendant herself testified about the conversation. Just as the defendant was obligated to invoke the privilege for her clients, she, as their agent, was capable of waiving it for them. *In re Grand Jury Investigation of Ocean Transportation*, 604 F.2d 672 (D.C.Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979).[16] Although she was no longer serving as Smith's counsel at the time of her trial, her obligation to assert the privilege was a continuing one. 8 Wigmore, Evidence § 2322, at 630–31.[17] Defendant's failure to guard the privilege at the first trial constituted a waiver of the privilege. *Weil, supra*, 647 F.2d at 24–25 & n.13 (failure to object to introduction of privileged communication constitutes waiver). Since the privilege was waived at the first trial, it cannot be invoked successfully for purposes of the second trial. 8 Wigmore § 2328, at 638–39. The burden is on the defendant to prove that there was no waiver, *Weil*, 647 F.2d at 25, and she has not met that burden.

In sum, the court has concluded that although the defendant has standing to assert the privilege and an attorney-client relationship did exist with respect to the April 7 conversation, the privilege does not protect the conversation in question on the grounds that the purpose of the privilege would not be served by its application, the crime/fraud exception to the privilege applies, and, in any event, the privilege has been effectively waived.

## B. *Governmental Intrusion Into The Attorney-Client Relationship*

 In our system of criminal justice, the attorney-client relationship is insulated from governmental intrusion by the Sixth Amendment's guarantee of the right to counsel. *See, e.g., Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Zarzour*, 432 F.2d 1, 3–5 (5th Cir. 1970). Thus, if the government illegally intrudes into the attorney-client relationship, the evidentiary rewards of that intrusion may not taint any subsequent judicial proceedings, *Black v. United States*, 385 U.S. 26, 28–29, 87 S.Ct. 190, 191–192, 17 L.Ed.2d 26 (1966), whether that evidence is offered against the client, *United States v. Orman*, 417 F.Supp. 1126 (D.Colo.1976), or the attorney, *United States v. Valencia*, 541 F.2d 618 (6th Cir. 1976). The use of such evidence violates the Sixth Amendment. *See Weatherford v. Bursey*, 429 U.S. 545, 552, 97 S.Ct. 837, 842, 51 L.Ed.2d 30 (1977) (evidence obtained in violation of Sixth Amendment cannot be used in seeking conviction) (dictum); *United States v. Melvin*, 650 F.2d 641, 643–44 (5th Cir. 1981) (use of illegally acquired evidence against defendant in criminal prosecution constitutes prejudice for purposes of Sixth Amendment) (applying *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)). Since "a

---

14. Since the corporations were no longer operating at the time of trial, they could not have asserted the privilege themselves.

15. Although defendant did submit a motion seeking suppression of the evidence, that motion, filed on June 3, 1981, failed to assert the attorney-client privilege as a basis for suppression. The motion instead raised only a Sixth Amendment intrusion argument, which defendant renews in the instant motion.

16. The court also notes that the client himself, Harold Smith, was present during much of the defendant's trial, eventually taking the stand to testify in her behalf. Although Smith thus had knowledge of the proceedings, he did not assert the privilege for either himself or his defunct corporations.

17. Although the defendant's corporate clients were no longer operating at the time of trial, her obligation to invoke the privilege for their benefit had not terminated. *See Baldwin v. Commissioner*, 125 F.2d 812, 814 (9th Cir. 1942) ("The privilege does not terminate by the death of the client."); *United States v. Osborn*, 561 F.2d 1334, 1340 (9th Cir. 1977) (same); 8 Wigmore § 2323, at 630–31 (same).

lawyer has standing to challenge any act which interferes with his professional obligation to his client," *Wounded Knee Legal Defense/Offense Committee v. F. B. I.,* 507 F.2d 1281, 1284 (8th Cir. 1974), the defendant may assert her clients' right to effective assistance of counsel. *See id.; Keker v. Procunier,* 398 F.Supp. 756, 765 (E.D.Cal. 1975); *United States v. Valencia,* 541 F.2d 618 (6th Cir. 1976) (by implication).[18]

The court has found that an attorney-client relationship did exist on the facts of this case, and there can be little doubt that the government did in fact intrude into that relationship. Although the government's conduct in wiring Key for sound and sending her to the defendant's office does mandate the closest scrutiny by the court, the question is whether the government's intrusion into defendant's relationship with her clients was illegal. For three reasons, the court finds no Sixth Amendment violation.

 First, the government did not interfere with the defendant's representation of her clients. Where the government's investigation of an attorney's suspected criminal activity does not intrude upon the client's defense, the Sixth Amendment right to effective counsel, which ultimately protects the client, not the attorney, is not violated. In accordance with the

government's instructions, Key avoided discussion of the defense case, the conversation here being directed to Key's appearance before the grand jury. These facts are therefore distinguishable from those in *United States v. Valencia,* 541 F.2d 618 (6th Cir. 1979), where the government informant, in obtaining evidence against the attorney, intruded into the attorney's representation of his client. *See id.* at 621 (informant, who listened to attorney-client conversations, gathered incriminating statements of client and co-defendants).[19] Here, however, the intrusion dealt only with what the defendant wanted Key to tell the grand jury. Admittedly, the announced purpose of the April 7 conversation—to discuss Key's grand jury appearance—was of interest to defendant's clients since Key's testimony would cover Smith's business transactions, but what was actually discussed on April 7—that Key should support what the defendant herself had told the grand jury— was not at the direction of or for the benefit of defendant's clients.

Nor is the Sixth Amendment violated where, as here, the government intrudes into an unlawful communication. *See Valencia,* 541 F.2d at 621 (Sixth Amendment violated since government intruded into

---

**18.** Nothing in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), is contrary to this court's holding that the defendant has standing to complain of intrusion into the attorney-client setting. *Rakas* dealt only with expectations of privacy in the Fourth Amendment context, and the Court confined its decision to that area. *Id.* at 139–40, 99 S.Ct. at 428. The holding in *Rakas,* that an individual has no legitimate Fourth Amendment privacy interest in items left in another's car, does not suggest that an attorney has no legitimate Sixth Amendment privacy interest in attorney-client communications made in her office. *See also Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (defendant-teacher in criminal prosecution can assert rights of his audience to contraceptives); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (defendant-physicians in a criminal proceeding can raise privacy rights of their patients).

**19.** *Valencia* is distinguishable from this case in the manner as well as the degree of intrusion. In *Valencia,* the government investigated the

attorney's client by paying the attorney's secretary for information about the client's criminal activity. The secretary provided investigators with the attorney's files, which contained notes of attorney-client conversations. The secretary also revealed wrongdoing by the attorney. In approving the trial court's dismissal of the charges against the attorney, the Sixth Circuit stated that "it was improper for the government to have intruded into an attorney-client relationship by paying an attorney's secretary for information about his clients. If any convictions here were affected by the taint of this highly irregular, and we trust, unusual arrangement, we would not hesitate to set aside the convictions." 541 F.2d at 623. Thus, the court in *Valencia* appears to have limited its holding to the "unusual" method of intrusion involved in that case. *Valencia* therefore does not apply where, as here, the *client's* secretary is the informant and she provides the government not with information about attorney-client communications, but with information about her own conversation with the attorney.

lawful as well as unlawful attorney-client communications). Just as the attorney-client privilege cannot be invoked to shield an attorney's criminal or fraudulent acts, the attorney-client relationship cannot be used to prevent the government's investigation of an attorney's suspected criminal or fraudulent activity. Although intrusions into the attorney-client setting should rarely be permitted, where an employee of the client informs the government that counsel for the client is advising the employee to give untruthful evidence in the defense of a case, the government, with the employee's consent, should be able to corroborate the employee's report by tape-recording conversations between the employee and the attorney as long as defense matters are not discussed. That is a narrow line to tread, but to hold otherwise would grant attorneys immunity from investigation and reduce the government's case against the attorney to a swearing match between the attorney and the employee. Although the decision in *Upjohn v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), extended the attorney-client relationship to communications between corporate counsel and corporate employees, it did not insulate attorneys from investigation for crimes or fraud committed in their professional capacity.

Defendant's intrusion argument must be rejected on a third ground as well. Since the Sixth Amendment right to effective counsel, like the attorney-client privilege, is based on the confidentiality of the communication, neither the constitutional protection nor the evidentiary rule should be applicable where the parties to the communication should have reasonably foreseen the possibility of a breach of confidentiality by one of the persons present. Thus, in *United States v. Gartner,* 518 F.2d 633 (2d Cir.), *cert. denied,* 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975), the Second Circuit found no illegal intrusion into the attorney-client setting where the defendant and his attorney had sought a meeting with a third person, knowing that person to be a government informant. "By so doing, they did not rely upon any confidential relationship between the two as attorney and client but

instead with their eyes open took the risk that the suspected colleague might be wired for sound ...." *Id.* at 637–38. More recently, in *United States v. Melvin,* 650 F.2d 641 (5th Cir. 1981), the Fifth Circuit adopted the *Gartner* rule, broadening it considerably.

In *Melvin,* the defendants and their attorneys had arranged a meeting with a co-defendant, unaware that the co-defendant was actually a government informant. What the defendants and their attorneys did know, however, was that the co-defendant was trying to obtain separate counsel and that he was somewhat reluctant to attend the defense meeting. That knowledge, the court suggested, was sufficient to put the defendants on notice that their co-defendant was not a part of the defense team, *id.* at 646, and the court remanded this factual issue to the district court for determination. Nevertheless, the court did hold that there is no illegal governmental intrusion into the attorney-client relationship "when disclosures are made in the presence of a person [the informant] who has not joined the defense team, and with respect to whom there is no reasonable expectation of confidentiality." *Id.*

The facts of the case at bar are similar enough to those in *Gartner* and *Melvin* to make those cases persuasive authority. The defendant and her co-counsel knew that Key was cooperating with the FBI, that she had been granted immunity, and that she had obtained separate counsel. With that knowledge, defense counsel had asked Key to contact them when she got her grand jury subpoena so that they could review it with her. One need not speculate as to the effect which the knowledge of those facts should have had on the defendant. She herself has testified that Key could not be trusted. Based on the principles announced in *Gartner* and *Melvin,* the defendant and her clients had no reasonable expectation of confidentiality in the April 7 conversation.

Because the government did not interfere with the defendant's representation of her clients, because the intrusion was into an

unlawful communication, and because no legitimate expectation of confidentiality attached to the conversation, the court finds no violation of the right to counsel.

## C. *Fourth Amendment Search and Seizure*

■ Defendant contends that the government's warrantless intrusion into the attorney-client setting violated the Fourth Amendment ban on unreasonable searches and seizures. Although it is well established that "[a] sound recording made by . . . a government agent with the permission of one of the parties to the recorded conversation is not a violation of the Fourth Amendment," *United States v. King*, 587 F.2d 956, 962 (9th Cir. 1978), defendant nevertheless argues that in this case the government was required to seek a warrant before it intruded into the attorney-client setting. She advances the argument that even though Key consented to the intrusion, the circumstances surrounding this conversation justified the defendant's expectation of privacy and that therefore a warrant was required.

■ It is true that Fourth Amendment protections forbid the unreasonable "search" of conversation, *Berger v. New York*, 388 U.S. 41, 51, 87 S.Ct. 1873, 1879, 18 L.Ed.2d 1040 (1967), and that the particular defendant's *justifiable* expectations of privacy should determine the scope of the protection. *United States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971) (plurality opinion) (construing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).[20] Nevertheless, it is also well established that a wrongdoer has no justifiable expectation of privacy under the Fourth Amendment where he has mistakenly confided in a government informant.

> [T]he law permits the frustration of actual expectations of privacy by permitting authorities to use the testimony of those associates who for one reason or another have determined to turn to the police. . . . If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the . . . [government's] case.

*Id.; accord, Katz v. United States*, 389 U.S. 347, 363 *, 88 S.Ct. 507, 517, 19 L.Ed.2d 576 (1967) (White, J., concurring). Thus, unless the fact that the conversation took place in an attorney-client setting requires a different result, the defendant here had no cognizable privacy interest in her conversation with the informant Key since Key had consented to be recorded.

Put simply, the thrust of defendant's argument is that the "informant exception" to the Fourth Amendment should not apply where the government intrudes into an attorney's office under circumstances where the attorney is actually functioning as an attorney. Defendant contends that in that factual setting, the attorney has a justifiable expectation of privacy and that a warrant is required despite the use of an informant. In support of this argument, defendant relies primarily on *Katz v. United States, supra*.[21]

■ Intrusions into the attorney-client setting are certainly to be deplored,

---

**20.** Although none of the separate opinions in the *White* case commanded the support of a majority of the Court, the plurality opinion was subsequently adopted as the law of the Ninth Circuit. *See Holmes v. Burr*, 486 F.2d 55, 60 (9th Cir.), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 850, 38 L.Ed.2d 744 (1973); *United States v. Puchi*, 441 F.2d 697, 700 (9th Cir.), *cert. denied*, 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971).

**21.** In *Katz*, the government tape-recorded the defendant's telephone conversations by means of an electronic device attached to the outside of the public telephone booth he was using. The government did not seek a warrant authorizing this method of investigation, and neither party to the conversations consented to be recorded. The Court found that the government's conduct violated the Fourth Amendment since "in electronically listening to and recording the petitioner's words, [it] violated the privacy upon which he justifiably relied while using the telephone booth." 389 U.S. at 353, 88 S.Ct. at 512.

and in some cases an intrusion into that setting may so implicate the Sixth Amendment right to counsel that a court would be compelled to reject the informant exception. However, this is not such a case. Here, as has been discussed, there was no intended or actual interference with the representation of defendant's clients and thus no violation of the Sixth Amendment right to counsel. *See Hoffa v. United States*, 385 U.S. 293, 300–03, 304–10, 87 S.Ct. 408, 412–14, 414–17, 17 L.Ed.2d 374 (1966) (applying informant exception where informant intruded into attorney-client communications without violating Sixth Amendment). Moreover, there was no justifiable basis for the defendant's expectation that the confidentiality of the conversation or the privacy of the setting would be maintained by Key, particularly since the defendant invited Key to her office knowing that Key was an informant.

As no Sixth Amendment considerations are involved here, the defendant's argument is simply that any intrusion into a conversation conducted in her law office between herself, as an attorney, and Key, as a former employee of her clients, requires a warrant. That line of argument appears to be seriously weakened, if not totally foreclosed, by the Ninth Circuit decision in *Holmes v. Burr*, 486 F.2d 55 (9th Cir.), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 850, 38 L.Ed.2d 744 (1973).

In *Holmes*, the Arizona state authorities had suspected the defendant, an attorney, of fraudulently obtaining money from one of his clients. With that client's consent, but without a warrant, the state officials tape-recorded a telephone conversation between the attorney and the client. At the attorney's trial for grand theft, the government, over the attorney's objection, introduced the tape recording into evidence. After conviction, the attorney argued in collateral proceedings before the Ninth Circuit that the Fourth Amendment prohibited such a warrantless invasion of his privacy.

The Ninth Circuit rejected this claim, however, applying the informant exception of the Fourth Amendment. Although in *Holmes* the intercepted conversation was by telephone, it was between the attorney and the client himself, not merely a former employee of the client. Under those circumstances, the attorney's expectation of privacy in the conversation should have been far more justifiable than in the instant case. Yet a warrantless intrusion was upheld on the ground that the client was an informant. The fact that here the client's former employee was the informant would, if anything, seem to present a weaker case for the requirement of a warrant.

The majority in *Holmes* discussed at length the effect of *Katz* on the consensual interception of oral communications, concluding that *United States v. White, supra*, and not *Katz*, was controlling. In *White*, the issue was whether the Fourth Amendment barred the testimony of government agents who overheard the defendant's incriminating statements by way of a radio transmitter attached to the person of a government informant. The Supreme Court held that the evidence was admissible despite the absence of a warrant. Significantly, the majority in *Holmes* recognized the potential scope of its reliance on *White*, stating that "the government's conduct raises serious questions as to the nature and extent ... [of] one's right to privacy." 486 F.2d at 60. However, noting that in *Katz* there was no consensual interception, it concluded that the defendant's Fourth Amendment argument should be rejected. This court reaches the same conclusion. The mere fact that the defendant was an attorney talking to a former employee of her clients and that the conversation in question occurred in her office does not legally justify her expectation of privacy. An attorney's actual expectation of privacy is not the subject of special constitutional protection.[22] Because Key consent-

---

**22.** Defendant's reliance on *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), is misplaced as that decision did not discuss the legality of warrantless consensual searches in the attorney-client setting. In *Osborn*, the investigators had actually sought and obtained a search warrant. The Court therefore declined to decide whether the warrant

ed to be tape-recorded, the government's actions did not violate the Fourth Amendment.

### D. Consent Under 18 U.S.C. § 2511(2)(c)

 Before government authorities can lawfully tape-record a conversation, they must satisfy the consent requirement of 18 U.S.C. § 2511(2)(c). That statute provides:

> It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where . . . one of the parties to the communication has given prior consent to such interception.

It is not disputed that "one of the parties" to the April 7 conversation, Key, agreed to the taping of that conversation. Nevertheless, the defendant contends that the government failed to comply with Section 2511 since Key was not legally competent to consent. According to this argument, Key could not consent within the meaning of the statute because she was not empowered to waive the attorney-client privilege for defendant's clients. However, even assuming that an employee cannot waive the privilege held by her employer—an issue which the court does not decide—this argument has no relevance under Section 2511. Defendant's consent argument mistakenly assumes that the statute is concerned with legal capacity to consent. Such is not the case, however. The only issue under the statute is a factual one: did the individual "voluntarily" consent? *See United States v. Franks*, 511 F.2d 25, 31 (6th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975); *United States v. Osser*, 483 F.2d 727, 730 (3d Cir.), *cert. denied*, 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 221 (1973). The statute simply requires that one of the parties *physically* present agree to have the conversation recorded. Defendant's attempt to construe "one of the parties" to include persons not physically present (*i.e.*, her clients) is inconsistent with the plain meaning and legislative history of the statute. *See* S.Rep.No.1097, 90th Cong., 2d Sess. 66–76, 93–94 (1968), *reprinted in* [1968] U.S.Code Cong. & Ad.News 2112, at 2153–63, 2182. Thus, "[i]n order to establish consent to taping of conversations, it will ordinarily suffice for the government to show that the informant engaged in the conversation knowing that it was being taped." *United States v. Glickman*, 604 F.2d 625, 634 (9th Cir. 1979), *cert. denied*, 444 U.S. 1080, 100 S.Ct. 1032, 62 L.Ed.2d 764 (1980). This prerequisite has been met here. Finally, it should be noted that a grant of immunity to the consenting individual does not render the consent involuntary. *United States v. Rich*, 518 F.2d 980, 985 (8th Cir. 1975), *cert. denied*, 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976).

### CONCLUSION

The purpose of the attorney-client privilege is to further the administration of jus-

was necessary and instead discussed only the specificity requirements of a warrant, concluding that the warrant before it met those requirements.

In applying the informant exception to the court declines to follow the suggestion in *Unit*-suggestion in *United States v. Neal*, 532 F. Supp. 942, 950 (D.Colo.1982), that the exception does not apply to conversations within the scope of an evidentiary privilege. In *Neal*, the court hypothesized that where the particular privilege, for example, the attorney-client privilege, does *not* require exclusion of the recorded conversation, then the Fourth Amendment should, despite the use of an informant. *White*, however, suggests otherwise. That decision holds that warrantless recordings made by an informant are constitutional because, even in the absence of a warrant, the Fourth Amendment would allow the informant to tes-

tify at trial about the conversation; if he can so testify, he should be able to record the conversation. *See* 401 U.S. at 749–52, 91 S.Ct. at 1124–25. Similarly, where the disputed conversation, although within the scope of a privilege, is not excluded by it, the informant can testify about the conversation, *see Hoffa v. United States*, 385 U.S. 293, 300–03, 87 S.Ct. 408, 412–14, 17 L.Ed.2d 374 (1966); if the privilege permits the testimony, the Fourth Amendment should permit the conversation to be recorded. *See United States v. Engleman*, 648 F.2d 473, 480 (8th Cir. 1981) (applying informant exception where wife consented to recording of spousal communications). Further, *Neal* should not be followed where, as here, the basis for applying the Fourth Amendment—to protect the suspect's privacy—has been destroyed through the suspect's own decision to meet with a known informant.

tice, not to thwart it. Here, for the reasons stated, the purpose of the privilege would not be served by its application. In addition, the privilege cannot be invoked to shield the attorney from responsibility for her own criminal or fraudulent communications. As a last point, it is manifest that the privilege has been effectively waived. With respect to the Sixth Amendment argument, it has been demonstrated that the governmental intrusion into the attorney-client relationship in this case did not occur in a confidential setting, that it did not interfere with the attorney's representation of her clients, and that, in any event, the intrusion was into an unlawful communication. Further, the Fourth Amendment ban on unreasonable searches is not implicated where, as here, the criminal suspect mistakenly confides in a government informant. Finally, because 18 U.S.C. § 2511(2)(c) simply codifies the informant exception of the Fourth Amendment, the defendant's statutory argument fails for the same reason as her constitutional claim.

For all of the foregoing reasons, defendant's motion to suppress is denied.