UNITED STATES of America, Plaintiff,

v.

Jake Keller NEAL, Defendant.

Crim. A. No. 81–CR–236.

United States District Court,
D. Colorado.

Feb. 25, 1982.

Robert N. Miller, U. S. Atty., Denver, Colo., for plaintiff.

Michael G. Katz, Federal Public Defender, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

The United States (hereafter, "the government") has indicted the defendant Jake Keller Neal charging one count of bank robbery and homicide in violation of 18 U.S.C. § 2113(a) and (e). Neal is accused of having robbed the Midland Federal Savings and Loan Office at 295 West Hampden Avenue, Englewood, Colorado, of $14,100 on April 29, 1981. A female teller assaulted during the robbery died from her injuries a few days later.

On December 10, 1981, in the course of seeking evidence to implicate the defendant in this crime, an FBI agent listened to and tape recorded three telephone conversations between Neal and his wife Marcia. A promise of immunity from prosecution was used to obtain Mrs. Neal's consent to the telephone monitoring and tape recording. In this effort to induce the defendant to incriminate himself, his wife asked him questions suggested to her by the FBI agent. The questions were apparently designed to bait the defendant to respond with incriminating answers.

No warrant was sought for this action. The decision to monitor and record the conversations apparently was made by an FBI field agent. There is no evidence that any authorization was sought or obtained from the agent in charge of the Denver FBI office, the United States Attorney, or any other Justice Department official. Nor is there any evidence that the FBI agent did not act in good faith.

Defendant Neal, invoking the marital communications privilege, moves to prevent the government from introducing at his trial any evidence of the contents of those three conversations. The parties agree that if the proposed evidence is to be admitted at the trial, it would have to be introduced through one or more of three means: (1) testimony of the defendant's wife, Marcia Neal; (2) testimony of the government agent who listened to the conversations, or (3) playing the tape recordings to the jury.

At a hearing on the defendant's motion to suppress this evidence, his wife described the circumstances under which the government obtained her consent to listen to and record the telephone calls. Both parties submitted briefs and oral argument. I took the motion under advisement after asking counsel to submit supplemental briefs on the possible applicability of *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). Those briefs have been filed and reviewed.

Pursuant to the parties' joint written request, I have listened to tape recordings of the conversations at issue. In the conversations Mrs. Neal's tone is that of a frightened, dependent wife confiding in her husband her fears that the police are upon her and seeking his advice and reassurance. The husband changed phones during the calls, lowered his voice in an apparent effort to avoid being heard by anyone but his wife, and generally demonstrated great reluctance to respond to his wife's "planted" inquiries. The overall character of the monitored conversations was set by the wife's opening question in the first call when she asked her husband, "Is there somewhere I can talk to you without anybody bothering us?"

## I. *Issues.*

The issues presented by this motion are whether the marital communications privilege: (1) precludes testimony by Marcia Neal of her husband's statements to her in the three telephone conversations; (2) prevents any government agent who overheard the conversations from testifying about them; or (3) prohibits introducing the tapes into evidence at trial.

At the outset it is essential to state what is *not* here at issue. Only the defendant husband is here asserting the marital communication privilege. His wife, in exchange for immunity from prosecution, has agreed to cooperate in the investigation and prosecution of her husband and to testify against him. Thus she does not assert her marital communication privilege. It is only the defendant husband's statements to her, sought to be used against him as admissions, that are in issue.

■ Nor has the wife claimed her broader right to refuse to take the stand at all against her husband. That distinct right is hers alone to exercise or waive as she chooses. *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). Thus her right to testify to what she observed, or to what she knows about the events in question, through sources other than privileged communications from her husband, is not here involved. The narrow issue, therefore, is whether the husband's privilege to communicate in confidence with his wife entitles him to suppress his statements to her in the three December 10, 1981 phone conversations. Apparently, this is a question of first impression in the federal courts.

## II. *Applicable law.*

Testimonial privileges in federal courts are governed by F.R.E. 501, which provides in part:

"Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience."

Prior to adoption of Rule 501 in its present form, the Supreme Court had approved and sent to Congress a rule expressly setting out the recognized evidentiary privileges, including that protecting husband-wife communications. The Senate Judiciary Committee, while not including in the Rules the Supreme Court's list of testimonial privileges, took pains to disclaim any intention of disapproving the husband-wife privilege, or the other privileges contained in the Supreme Court's version of the rule. 10 *Moore's Federal Practice* § 501.01[5]. Rather, the Committee expressed in this rule its preference "that the recognition of a privilege based on a confidential relationship ... should be determined on a case-by-case basis." *Id.* Thus we must refer to case law.

■ The Supreme Court has long recognized the common law privilege against disclosure of communications between spouses. *See Trammel v. United States*, 445 U.S. at 51, 100 S.Ct. at 912; *Blau v. United States*, 340 U.S. 332, 333, 71 S.Ct. 301, 302, 95 L.Ed. 306 (1951); *Wolfle v. United States*, 291 U.S. 7, 13, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934). In fact, this privilege is the second oldest testimonial privilege recognized at common law. VIII *Wigmore on Evidence*, § 2333 (McNaughton rev. 1961) (hereafter, "*Wigmore*").

"The essence of the privilege is to protect *confidences* only.... The purpose is to insure subjectively the unrestrained privacy of communication, free from any fear of compulsory disclosure. It follows that if the communication is not intended to be a private one the privilege has no application to it." *Wigmore*, § 2336 (emphasis in original).

Marital confidences are considered "so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails." *Wolfle*, 291 U.S. at 14, 54 S.Ct. at 280. An interspousal communication is presumed to be confidential, although that presumption may be overcome by proof that it was not intended to be private. *Pereira v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1954).

Such testimonial privileges, however,

"contravene the fundamental principle that 'the public has a right to every man's evidence.' [Thus,] they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Trammel*, 445 U.S. at 50, 100 S.Ct. at 912 (citations omitted).

■ In carrying out the duty imposed by Rule 501 to consider each case of confidential communication privilege on a case by case basis, courts cannot be oblivious to the

effects of their decisions on related privileges. The task before me would be less difficult were I free to apply one rule of evidence law to admit such evidence in emotion-laden murder cases, and a different rule to enforce the privilege in cases involving lesser crimes. Indeed, weighing the public interest in convicting criminals against the public interest in protecting the sanctity of marital privacy against prying government investigators, it may be that more serious crimes should weigh more in the balance, thus justifying application of different rules to different kinds of crime.

■ Thus, for example, if this issue had arisen in a run-of-the-mill income tax case, it would seem simpler. If, in such a case, the government had promised a wife not to pursue her liability on a joint tax return in exchange for her cooperating to ensnare her husband through phone calls like these, the legal issues might have been seen unobscured by feelings naturally stirred in a murder case. Emotions, however, cause hard cases to make bad law. Absent some contrary guidance from the Supreme Court, I must apply in this case the same rule to be applied in all cases—of all types.

Over at least the past decade, the circle of privacy surrounding each of us has drawn smaller with each new governmental incursion and each new technological advance. Courts have sought to preserve inviolable some small island of privacy as a refuge for the human spirit where government may not intrude. Here the question is whether one such sanctuary, protected by the common law for centuries, shall be breached, rendering the secrets told to wives by husbands fair game for government investigators.

The issue is whether in our free society the government may, by making a deal with one's spouse, invade the confidences of marriage to turn those nearest and dearest into informers.[1] Once the marital confidential communication is breached, other like sanctuaries of testimonial privilege cannot prevail against similar invasions, for they are shielded only by similar evidentiary privileges of no less penetrable nature. Thus, by pre-arrangement with a criminal suspect's priest, minister or rabbi, psychiatrist or other physician, or lawyer, the police could obtain much information of great value in combatting crime. The only question is whether the price would be too high.

■ Because of this tension between society's desire to protect marital privacy and the duty of courts to find the truth, the marital privilege has been strictly limited to communications between persons actually married when the communication took place. *See Wigmore* § 2335. Moreover, certain exceptions to the privilege have been recognized. Three of those exceptions must be discussed in relation to this case.

■ The first exception provides that communications made by a spouse who knows that a third person is present are not protected from disclosure. *Pereira*, 347 U.S. at 6, 74 S.Ct. at 361; *Wolfle*, 291 U.S. at 14, 54 S.Ct. at 280. A spouse who is aware of a third party's presence cannot be said to intend his or her statements only for the other spouse; thus the essence of confidential marital communication is absent. No justification exists, therefore, to prevent anyone present during the conversation from testifying about what either spouse said to the other.

■ The second exception allows testimony of communications between spouses regarding a future crime, or a crime in progress when the conversation occurs. *See McCormick on Evidence* 164–65, 199–200 (2d ed. 1972) (hereafter, "*McCormick*") (future crime); *United States v. Mendoza*, 574 F.2d 1373, 1381 (5th Cir. 1978) (crime in progress). This exception is rationalized on the ground that the public benefit advanced by protecting marital communication is minimal, if not nonexistent, when spouses exploit their privacy to plan or perform criminal acts.

---

1. Ample precedent from recent history demonstrates the "efficiency" of such police methods.

*See, e.g.*, Solzhenitsyn, *The Gulag Archipelago*, 40 (Harper and Row 1973).

■ The third exception allows persons who overhear marital communications to testify about what the spouses said to each other. *Wigmore*, § 2339, *McCormick* 167. A number of courts and commentators, however, recognize an exception to this exception when the third party is able to overhear the conversation only through the connivance or treachery of one spouse "setting up" the other. *See McCormick* 168. This third exception, and its sub-exception, will be discussed below in greater detail.

### III. *Specific applications of the marital communications privilege.*

#### A. *Whether the wife may testify regarding the December 10, 1981 conversations.*

■ Jake Neal argues that his marital privilege precludes his wife's testifying about what he said in the December 10, 1981 conversations. The parties agree that Jake and Marcia Neal are presently married, have been married for nearly fifteen years, and were married when the questioned conversations occurred. Nor is there any dispute that, as to his statements, the defendant as the *communicator* is the holder of the privilege, and that his wife's willingness to testify does not, by itself, abrogate his privilege. *Wigmore* § 2340; *McCormick* 169–70.

The government contends that Mrs. Neal may testify to the substance of the conversations because: (1) the conversations occurred in the "presence" of a third-party, the FBI agent who monitored the call, and (2) the conversations related to present or future crimes, and thus are not protected by the privilege.

■ I conclude that the "presence-of-a-third-party" exception is inapplicable here. The rationale behind this exception is that a spouse's willingness to speak to the other spouse, knowing that a third party is present, indicates an intent that the communication not be confidential. *See Wolfle*, 291 U.S. at 14, 54 S.Ct. at 280. Here, however, there is no evidence that Mr. Neal, who asserts the privilege, knew that a third party was on the telephone line. *See Nash v. Fidelity-Phenix Fire Ins. Co.*, 106 W.Va. 672, 146 S.E. 726, 727 (1929).[2] *Cf. People v. Santos*, 26 Cal.App.3d 397, 102 Cal.Rptr. 678, 681 (1972). (during conversation, one spouse mentioned probability that phones were monitored). Absent some showing that the defendant was aware that someone besides his wife was listening, the government cannot overcome the presumption of confidentiality that attaches to marital communications.

Nothing in the tapes indicates that Mr. Neal knew of the agent's eavesdropping. In fact, his conduct during the conversations strongly indicates that he intended his statements to his wife to be confidential. He kept his voice low and changed telephones, apparently to prevent being overheard by persons near the phone into which he was speaking. Nor is there any indication in the tapes that he suspected his wife had become a government agent.

■ I find that the government's second argument, relying on the present and future crimes exception, also must fail. My review in camera of the tapes indicates that the recorded conversations contain no evidence of either future crimes, or crimes in progress when the conversations took place. Such a connection, however, may not be obvious. For that reason, I do not foreclose the government from offering such evidence if it exists; *i.e.*, if further foundation evidence should place these conversations within the exception here under discussion, they may be admitted. For example, if Mrs. Neal's testimony at the trial establishes a future crime or crime in

---

**2.** In none of the cases cited by the government have the courts applied the third-party exception when the communicator spouse was unaware of the third party's presence. *United States v. Engleman*, 648 F.2d 473, 480 (8th Cir. 1981), although it supports admission of the tapes here, dealt only with Constitutional issues, and not with an assertion of the marital communications privilege. Since this privilege is waived if not asserted, the Eighth Circuit apparently was not confronted with the legal issue before me, and *Engleman* provides no guidance.

progress, her testimony may provide the predicate to bring these calls within this exception. Because of the prophylactic need to prevent disclosures before the jury which might cause a mistrial, the government shall inform defense counsel and the Court before it attempts to elicit at trial any evidence of marital communications falling within this exception. In addition, counsel for both sides shall brief this issue in advance of trial so that a prompt ruling can be made in order to minimize trial delays for hearings outside the jury's presence. Of course, all such issues may be raised by motions in limine.

Absent the further foundation just discussed, Marcia Neal may not testify at trial regarding the substance of the telephone conversations between herself and her husband. As stated before, she may testify regarding matters not protected by the marital privilege.

B. *Whether federal agents may testify regarding the telephone conversations.*

 Neal contends that the FBI agent or agents who overheard and taped the telephone calls cannot testify about them because the eavesdropping was made possible only by his wife's cooperation, connivance, or betrayal. The government argues that Mrs. Neal's cooperation is immaterial to the defendant's attempted assertion of his privilege, and that its agents should be permitted to testify to what was heard.[3]

The parties agree that most jurisdictions permit a garden variety eavesdropper to testify to conversations between spouses.[4] Although acknowledging that this rule breaches the protection normally accorded marital communications,[5] most courts and commentators reason that excluding an eavesdropper's testimony unreasonably extends the marital communication privilege at the expense of unduly restricting the courts' ability to find the truth. *See McCormick* 168; *Wigmore* §§ 2326 and 2339.

But this is not an ordinary eavesdropper case. Here Marcia Neal surreptitiously permitted government agents to listen to her three conversations with her husband. Further, she acted as an agent provocateur, baiting her husband with FBI questions calculated to elicit from him incriminating responses. In effect, a suspect was being interrogated by the FBI while he thought he was conversing privately with his wife. The wife's cooperation, purchased by promising her immunity, was essential to the FBI's hearing and recording the husband's admissions. In such circumstances, Neal argues, the FBI agent is no ordinary eavesdropper, but rather an agent of Mrs. Neal through whom she attempts to betray the marital confidences entrusted to her by her husband. Although Mrs. Neal clearly would not be permitted, over her husband's objection, thus to betray his confidences by courtroom testimony, defense counsel argues that she is attempting to accomplish the same purpose indirectly by out-of-court duplicity in permitting the FBI to listen to her husband's marital communications. *See McCormick* 168.

There is a paucity of authority in point and the few, mostly old, cases extant are not in agreement. Some courts have permitted the eavesdropper to testify even when one spouse has cooperated in making the eavesdropping possible.[6] Apparently

---

3. The government does not claim that the FBI agent's eavesdropping, unknown to Neal, frees Mrs. Neal to testify. Such a claim would be contrary to the case authorities. *See Hunter v. Hunter*, 169 Pa.Super. 498, 83 A.2d 401, 404 (1951); *Nash v. Fidelity-Phenix Fire Ins. Co.*, 106 W.Va. 672, 146 S.E. 726, 727 (1929).

4. *See generally, Wigmore* § 2339 n. 1 and the cases cited therein; *McCormick* 167 n. 48–50 and the cases cited therein.

5. The California legislature has given such absolute protection to marital communications in Cal.Evid.Code § 980. Spouses in California may prevent testimony by all persons, even eavesdroppers, who attempt to disclose the substance of an inter-spousal confidence. *North v. Superior Court*, 8 Cal.3d 301, 104 Cal.Rptr. 833, 838, 502 P.2d 1305 (1972).

6. *People v. Swaile*, 12 Cal.App. 192, 107 P. 134, 137 (1909) (letter from husband to wife placed in unsealed envelope and handed to police officer, who delivered it to wife, asking her to

the majority, however, would exclude the testimony of an eavesdropper who learned of a marital confidence through a spouse's betrayal or connivance.[7] The federal authorities that bear on this question seem to support the majority rule, insofar as they support either position.[8]

The rationale for excluding such testimony when one spouse has participated in its acquisition is inherent in the reasons supporting the eavesdropper exception. The law refuses to suppress an ordinary eavesdropper's testimony since that testimony has no effect on one spouse's trust in the other. If an ordinary eavesdropper overhears a marital conversation, neither spouse can blame the other for breaching a confidence, and both are likely to continue imparting confidences, although they might become more cautious. When one spouse actively assists an eavesdropper who is seeking information to use against the other, a quite different situation is presented.

■ Such connivance, of course, destroys the betrayed spouse's feeling of trust toward his mate. From that point on there can be no real sense of marital privacy, no real sharing of secrets, no real mutual trust, no real marriage in the sense of sharing all. This undermining of mutual trust resulting in destruction of the marriage itself is the evil the rule of privileged communication seeks to prevent. Spousal cooperation with a police eavesdropper inevitably must shatter the marital relationship, described recently by the Supreme Court as " 'the

best solace of human existence.' " *Trammel*, 445 U.S. at 51, 100 S.Ct. at 912, quoting *Stein v. Bowman*, 38 U.S. (13 Pet.) 209, 223, 10 L.Ed. 129 (1839).

One who bares his soul in privacy to his wife should not have to fear that, unbeknownst to him, the communicator, his words spoken to his wife are being heard and recorded by the police for later use against him, all without a warrant or any kind of warning to him. Here the better-reasoned cases have weighed the societal value of greater police efficiency against the societal value of marital privacy, and have come down on the side of marriage.

■ For these reasons, (subject to what was said above regarding evidence of future crimes or crimes in progress) no government agent may testify regarding the content of the December 10, 1981 conversations between Jake and Marcia Neal.

### C. Whether the tape recordings are admissible.

■ The government has not contended that the tape recordings are admissible if neither the testimony of Mrs. Neal nor that of the FBI agent is admissible. Whether treated as mere replicas of Marcia Neal's and the agent's proposed testimony, or as a separate government "eavesdropper," the tapes clearly are not admissible. *See North v. Superior Court*, 8 Cal.3d 301, 104 Cal. Rptr. 833, 837–39, 502 P.2d 1305 (1972); *People v. Dubanowski*, 75 Ill.App.3d 809, 31 Ill.Dec. 403, 394 N.E.2d 605 (1979).

return it after she had read it; letter returned and offered against husband held admissible); *State v. Sysinger*, 25 S.D. 110, 125 N.W. 879, 881 (1910) (letters from husband to wife delivered by wife to state prosecutors held admissible). Note that the California legislature has overruled *Swaile* by enacting Cal.Evid.Code § 980. *See* note 5, *supra*.

7. *Mercer v. State*, 40 Fla. 216, 24 So. 154, 158 (1898); *McKie v. State*, 165 Ga. 210, 140 S.E. 625, 628–29 (1927); *People v. Dubanowski*, 75 Ill.App.3d 809, 31 Ill.Dec. 403, 394 N.E.2d 605, 607 (1979); *Scott v. Commonwealth*, 15 Ky. 251, 23 S.W. 219, 220 (1893); *McCoy v. Justice*, 199 N.C. 602, 155 S.E. 452, 458 (1930); *Hunter v. Hunter*, 169 Pa.Super. 498, 83 A.2d 401, 404 (1951).

8. *Liggett v. Glenn*, 51 F. 381, 396–97 (8th Cir. 1892); *Bowman v. Patrick*, 32 F. 368 (C.C.E.D. Mo.1887) (per Justice Miller). The Supreme Court has noted in *Wolfle* that, under state law at least, a spouse's involvement in a disclosure to a third person may prevent that third person from testifying to the communication. 291 U.S. at 7, n. 1, 54 S.Ct. at 279. *See also Dickerson v. United States*, 65 F.2d 824, 827 (D.C.C.A.1933) (letter from husband to wife found among her effects after her death and turned over to the prosecution by an insurance representative admitted; since the wife was dead before the third party obtained possession of the letter, no connivance or betrayal occurred).

## IV. *Conclusion.*

■ The issues presented by Neal's motion have been decided under the federal common law of evidentiary privileges recognized in F.R.E. 501. Constitutional issues inherent in the case have not been reached because of the strong judicial policy against deciding questions on constitutional grounds when they can be determined under other law. *Siler v. Louisville & Nashville Rwy. Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909). The constitutional implications of the government's conduct in this case, however, are so serious that they must be mentioned in the event reversal of my decision on the basis of privilege requires consideration of the constitutional issues by a higher court.

I asked counsel to brief the question whether the Fourth Amendment provides greater protection against government interception of an interspousal conversation than against interception of other, non-privileged, conversations. In *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967), the Supreme Court recognized that electronic interception of a conversation may amount to a search and seizure within the meaning of the Fourth Amendment. Katz also reaffirmed the basic premise that "searches conducted outside the judicial process, without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment...." 389 U.S. at 357, 88 S.Ct. at 514.

In *United States v. White*, 401 U.S. 745, 750–54, 91 S.Ct. 1122, 1125–1127, 28 L.Ed.2d 453 (1971), the plurality opinion held that when one party to a conversation consents to electronic eavesdropping, the search and seizure is not unreasonable, even if done without a warrant, and therefore the Fourth Amendment is not violated. In part, *White's* rationale was that in most circumstances, a wrongdoer places trust in an accomplice at his or her own risk, and that confidences entrusted to an associate in crime carry no reasonable expectation of privacy. The opinion made clear that its holding was not dependent on the degree of trust subjectively felt by the speaker, but rather on the fact that the law does not recognize a constitutionally protected expectation of privacy in most conversations.

The question not answered in *White*, which has never been confronted directly [9] by the federal courts,[10] is whether a different result obtains under the Fourth Amendment when the conversation intercepted without a warrant occurs between a husband and wife with the consent of only one of them. Here the law does recognize a reasonable expectation of privacy. Thus the instant case poses the question left unanswered in *White.* There Justice White's plurality opinion plainly implies [11] that there are some constitutionally justifiable expectations of privacy in interpersonal conversations. Whether these include the long established privileges protecting confidences between husband and wife, priest and penitent, physician and patient, and lawyer and client is not answered. But if these ancient privileges are not at the core of privacy protected by the Fourth Amendment, it is difficult to imagine what might be.

Constitutional restraints on government investigatory methods are further implicated by the FBI's prompting Mrs. Neal with questions to ask her husband during the

---

**9.** *United States v. Engleman*, 648 F.2d 473, 480 (8th Cir. 1981), cited by the government here, does not consider whether the *White* rationale must be reassessed because of the special legal status accorded interspousal communications. Although the conversants in *Engleman* were married, the opinion does not address the issue of marital communications. The Court of Appeals held only that the trial judge did not abuse his discretion in admitting the evidence, leaving unanswered the question whether an exercise of discretion leading to an opposite result likewise would have been upheld.

**10.** *See North v. Superior Court*, 8 Cal.3d 301, 104 Cal.Rptr. 833, 837–39, 502 P.2d 1305 (1972) (per Burke, J.).

**11.** "Our problem, in terms of the principles announced in *Katz*, is what expectations of privacy are constitutionally 'justifiable'—what expectations the Fourth Amendment will protect in the absence of a warrant." *United States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1970).

monitored conversations. She testified that she felt free to use her own words, but knew she was to ask her husband, in substance, the questions furnished by the FBI. In effect, the FBI was interrogating its prime suspect through his wife, without his knowledge and without the usual warnings.

■ True, the warnings dictated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been required only when the police interrogate a suspect in a custodial setting, and this defendant was not in custody. When the government, however, invades the privacy of marriage by using a suspect's wife to goad him into incriminating himself when he thinks he is merely providing confidential reassurance in response to his nervous wife's questions, the suspect's Fifth Amendment rights arguably have been violated. Since I am not deciding this motion on constitutional grounds, I merely mention, in passing, this concern.

It is sufficient, for the present circumstances, to rely upon Rule 501 and the evidentiary privilege. In discussing the marital communication privilege, the Supreme Court has said:

"[it] is founded upon the deepest and soundest principles of our nature, principles which have grown out of those domestic relations that constitute the basis of civil society, and which are essential to the enjoyment of that confidence which should subsist between those who are connected by the nearest and dearest relations of life. To break down and impair the great principles which protect the sanctities of husband and wife, would be to destroy the best solace of human existence." *Bassett v. United States*, 137 U.S. 496, 505, 11 S.Ct. 165, 167, 34 L.Ed. 762 (1890), quoting *Stein v. Bowman*, 38 U.S. (13 Pet.) 209, 222–23, 10 L.Ed. 129 (1839).

If that rationale is to be undermined, it will have to be by the Congress or by some other judge.

Accordingly,

IT IS ORDERED that, absent a further showing, the government may not introduce evidence of the substance of the three December 10, 1981 conversations between the defendant Jake Keller Neal and Marcia Neal, whether by testimony of Marcia Neal or a government agent, or by tape recordings of those conversations.