**SECURITIES AND EXCHANGE COMMISSION, Applicant,**

v.

**Jack LAVIN, Respondent.**

**No. Civ. Action 95–M–393 RMU.**

United States District Court, District of Columbia.

Aug. 13, 1996.

---

Stephen J. Crimmins, Richard Wallace, Robert L. Furst, Securities and Exchange Commission, Washington, DC, for plaintiff.

Leslie Gordon Fagen, Bruce Birenboim, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

URBINA, District Judge.

### Granting the SEC's Motion to Compel

This matter comes before the court upon the Securities and Exchange Commission's (SEC) motion to compel compliance with its subpoena to Respondent, Jack Lavin. The subpoena requested disclosure of the tapes of seven telephone conversations between Mr. Lavin and his wife.[1] Mr. Lavin argues that these conversations are not subject to disclo-

---

1. Robin Lavin, Mr. Lavin's wife, filed a motion to intervene in this matter. The SEC does not oppose Mrs. Lavin's motion. The court thus grants her request to intervene.

sure due to the confidential marital communications privilege.

Upon consideration of the submissions of the parties and the entire record herein, the court concludes that the conversations at issue did not take place in a confidential setting and, therefore, the confidential marital communications privilege does not attach to those conversations.[2] Furthermore, the court determines that even if the privilege did attach, Mr. Lavin's actions resulted in a waiver of the privilege because he did not protect the confidentiality of the conversations. The court further concludes that Mrs. Lavin may not assert the privilege as to the subject conversations. Lastly, assuming *arguendo* that Mrs. Lavin could assert the privilege, the court decides that her actions have also resulted in a waiver of any confidential communications privilege claim she may have been able to assert. In an effort to address the Lavins' privacy concerns, the court will redact the segments of the conversations that do not specifically relate to Mr. Lavin's business matters.[3]

## I. BACKGROUND

In 1993, Jack Lavin was working in the New York office of Bankers Trust (BT).[4] One of Mr. Lavin's responsibilities in the New York office was to supervise traders.[5] These traders bought and sold various financial instruments, including derivatives, for BT clients. Due to the highly speculative nature of derivatives and other financial instruments, BT maintained a policy of tape recording all telephone calls that took place on certain telephones in the New York office.[6] These telephones were located on a trading floor within the New York office and were used primarily by the traders in their dealings with clients.[7] All the telephones on the trading floor were marked with a plaque to remind users that conversations on those telephones were tape recorded.[8] It was common knowledge among the members of the division where Mr. Lavin worked that BT maintained a tape recording policy.[9]

In January 1994, Mr. Lavin was transferred to become the head of BT's Chicago office.[10] Prior to Mr. Lavin's arrival in Chicago, that office did not have a tape recording policy because the employees in that office did not trade in derivatives.[11] When Mr. Lavin learned of this fact, he engaged in discussions with other BT employees concerning the implementation of a tape recording policy in the Chicago office. Mr. Iannuzzi, who at the time was in charge of BT's telecommunications, testified that Mr. Lavin himself, wanted a tape recording system in place because Mr. Lavin, among others, was to begin trading in derivatives from the Chicago office.[12]

After learning of alleged improprieties in BT's marketing of derivatives, the SEC and the Federal Reserve Bank initiated collateral investigations. As part of these investigations, the SEC and the Federal Reserve Bank have requested and received thousands of tape recordings of conversations involving BT employees. The Federal Reserve Bank currently has copies of the tapes at issue in

---

2. The court notes that an Ohio federal court entertained the same issue and reached a contrary result. *See Procter & Gamble v. Bankers Trust,* 909 F.Supp. 525 (S.D.Ohio 1995).

3. The court will issue redacted transcripts of the conversations to the SEC unless the Lavins file a notice of appeal within sixty (60) days of the entry of this order. *See* Fed.R.App.P. 4(a)(1).

4. J. Lavin Aff. at 1.

5. Testimony of Sal Iannuzzi at 10 (attached as Ex. B to O'Sullivan Aff.).

6. BT initiated this recording policy in the event that any transaction should give rise to litigation or regulatory investigation.

7. In the New York office, the telephone conversations in Mr. Lavin's personal office were not tape recorded. Mr. Lavin used the telephones on the New York trading floor for any calls he deemed needed to be tape recorded.

8. Testimony of Sal Iannuzzi at 9 (attached as Ex. B to O'Sullivan Aff.).

9. *Id.* at 10.

10. J. Lavin Aff. at 1.

11. *Id.* at 3.

12. Testimony of Sal Iannuzzi at 14 (attached as Ex. B to O'Sullivan Aff.).

this case and continues to enjoy access to them.

## II. ANALYSIS

The confidential marital communications privilege is one of two testimonial privileges available to married couples.[13] A person invoking the confidential marital communications privilege must satisfy a three-part test. *United States v. Duran*, 884 F.Supp. 537, 540 (D.D.C.1995) (citing *United States v. Evans*, 966 F.2d 398, 401 (8th Cir.), *cert. denied*, 506 U.S. 988, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992)).

 The privilege prevents the disclosure of private, confidential communications that take place between spouses as long as: (1) the words or actions at issue were intended by one spouse to be a communication to the other spouse; (2) the communication occurred during a valid marriage; and (3) the spouse intended for the communication to be confidential. *Id.* at 540. This privilege, like most other testimonial and evidentiary privileges, can be waived. *Id.*

### A. CONFIDENTIALITY

#### 1. Legal Standard

Testimonial privileges in federal courts are governed by Fed.R.Evid. 501. It states, in pertinent part:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience.

. In order for a conversation between spouses to be considered privileged, it must be confidential. A communication between spouses is presumed to be confidential.

*Wolfle v. United States*, 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934); *Blau v. United States*, 340 U.S. 332, 333, 71 S.Ct. 301, 302, 95 L.Ed. 306 (1951). However, this presumption can be rebutted. *Wolfle*, 291 U.S. at 14, 54 S.Ct. at 280. The burden is on the SEC to rebut the presumption of confidentiality. *Blau*, 340 U.S. at 333, 71 S.Ct. at 302. If the circumstances surrounding the communication indicate a lack of confidentiality, then no privilege will attach to the communication. *Wolfle*, 291 U.S. at 14, 54 S.Ct. at 280; *see also Pereira v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 361–362, 98 L.Ed. 435 (1954) (same). Disclosure to a third party rebuts the presumption of confidentiality accorded marital communications. *Wolfle*, 291 U.S. at 14, 54 S.Ct. at 280.

The issue before the court is whether the conversations between Mr. and Mrs. Lavin were confidential and, therefore, protected by the privilege.[14] This determination depends on whether or not Mr. Lavin knew or should have known that these conversations were being tape recorded. *See Wolfle*, 291 U.S. at 16–17, 54 S.Ct. at 281. The record demonstrates clearly that Mr. Lavin knew or should have known that conversations on his Chicago telephone were subject to being tape recorded and, therefore, the confidential marital communications privilege does not attach to the conversations at issue.

#### 2. Application

██ The testimony of BT employees, principally concerning conversations they had with Mr. Lavin regarding the tape recording operation, establishes, to this court's satisfaction that Mr. Lavin knew or should have known that conversations on his Chicago office telephone were being tape recorded.

Mr. Iannuzzi testified that, sometime between February 1994 and April 1994, Mr. Lavin told him that he (Mr. Lavin) wanted his own telephone in Chicago tape recorded because he (Mr. Lavin) would be transacting derivatives business out of the Chicago of-

---

**13.** The other is the adverse testimonial privilege. This second privilege is not at issue in this case.

**14.** The conversations at issue in this case took place on the following dates:

1.) June 17, 1994 @ 9:37 a.m.
2.) June 17, 1994 @ 2:20 p.m.
3.) July 13, 1994 @ 12:00 p.m.
4.) July 21, 1994 @ 11:48 a.m.
5.) July 21, 1994 @ 1:44 p.m.
6.) July 21, 1994 @ 3:17 p.m.
7.) July 22, 1994 @ 7:33 a.m.

fice.[15] On March 3, 1994, Mr. Lavin engaged in a telephone conversation from the New York office with a BT client, Gibson Greetings.[16] Mr. Lavin made this call from the New York office because he wanted to be sure the telephone call was tape recorded. Mr. Ugliarolo testified that, shortly after this call, he was asked by Mr. Iannuzzi to install a recording system in the Chicago office.[17] This fact corroborates Mr. Iannuzzi's statement that sometime between February 1994 and April 1994 Mr. Lavin asked to have conversations on his (Mr. Lavin's) Chicago telephone tape recorded.

Mr. Art Vallette, who was the office manager for BT's Chicago office in 1994, testified that shortly before the tape recording began in Chicago, Mr. Lavin told Mr. Vallette that he wanted calls on his (Mr. Lavin's) Chicago telephone tape recorded along with the calls of the two traders he was bringing with him from New York.[18] The tape recording process began on March 15, 1994. Mr. Vallette attested credibly to the fact that on more than two or three occasions after March 15, 1994, Mr. Lavin spoke with Mr. Vallette to make sure conversations on his (Mr. Lavin's) Chicago telephone were being tape recorded.[19]

Additionally, Mr. David Mellon testified that he performed several checks on the Chicago tape recording system to confirm that it was working.[20] Mr. Mellon testified that these checks were carried out in response to Mr. Lavin's request to Mr. Vallette that Mr. Vallette be sure that conversations on Mr. Lavin's Chicago telephone were being tape recorded.[21]

More importantly, Mr. Lavin's own words and actions demonstrate that he knew conversations on his Chicago office telephone were being tape recorded. First, Mr. Lavin claims to have had a discussion with Mr. Iannuzzi and Mr. Yellin in which he explicitly stated that he did not want conversations on his Chicago telephone tape recorded.[22] Mr. Iannuzzi, however, did not recall such a conversation taking place.[23] Significantly, Mr. Lavin has failed to offer affidavits or any credible proof from Mr. Yellin which could corroborate his claim that such a conversation took place.

Second, on July 19, 1994, Mr. Lavin had a telephone conversation with a client, Mr. Kennedy. Mr. Lavin made this call from the telephone in his Chicago office.[24] In another telephone call a few minutes later, Mr. Lavin references the previous call to Mr. Kennedy and tells his associate, Mr. Boggiano, that he (Lavin) wants to get a copy of the tape recording of the conversation. Mr. Lavin stated that "[I] want to actually get a copy of this tape...." [25]

The next day, on July 20, 1994, Mr. Lavin, in another tape recorded conversation from his Chicago office telephone, expresses his belief that, "I think what's happening now is they're just listening to every goddamn conversation that took place...." [26] This evi-

---

**15.** Testimony of Sal Iannuzzi at 13, 14 (attached as Ex. B to O'Sullivan Aff.). As previously referenced, in 1994, Mr. Iannuzzi had overall responsibility for the telecommunications within BT.

**16.** Testimony of Michael Ugliarolo at 12 (attached as Ex. D to O'Sullivan Aff.).

**17.** *Id.* at 15. In 1994, Mr. Ugliarolo was in charge of answering information requests made to BT by litigants and regulatory agencies.

**18.** Testimony of Art Vallette at 22 (attached as Ex. E to O'Sullivan Aff.).

**19.** *Id.* at 43, 45.

**20.** In 1994, Mr. Mellon was a technician and network administrator in BT's Chicago office.

**21.** Testimony of David Mellon at 8–9 (attached as Ex. C to O'Sullivan Aff.).

**22.** J. Lavin Aff. at 3. Mr. Yellin was assistant general counsel for BT at that time.

**23.** Testimony of Sal Iannuzzi at 20–21 (attached as Ex. B to O'Sullivan Aff.).

**24.** SEC Declaration Supporting Application For Order to Show Cause, Ex. H, Transcript of call beginning 4:46 p.m., line 4–5; Testimony of Mr. Lavin June 6, 1995, at 120 (attached as Ex. F to O'Sullivan Aff.).

**25.** SEC Declaration Supporting Application For Order to Show Cause, Ex. H, Transcript of call beginning 4:46 p.m. at 2.

**26.** *Id.*, Ex. H, Transcript of call beginning 7:27 p.m. on July 20, 1994 at 9.

dence, combined with the sworn testimony of Mr. Iannuzzi, Mr. Ugliarolo, Mr. Vallette and Mr. Mellon, all disinterested parties, establishes, at a minimum, that on or about July 19, 1994, Mr. Lavin knew that conversations on his Chicago telephone were being tape recorded. This time period is contemporaneous with the period in which the spousal conversations at issue took place.

The court notes that in one of the recordings at issue Mr. Lavin did say to his wife that their conversation was not being tape recorded.[27] In addition, the transcripts of the conversations at issue submitted for the court's *in camera* review indicate that the conversations are clearly of a personal nature. Nevertheless, it is significant that Mr. Lavin has failed to produce testimony or proof from any BT official verifying that conversations on his Chicago telephone were tape recorded without his knowledge or that the tape recording of his Chicago telephone was a mistake.[28] Moreover, the testimony of Mr. Iannuzzi, Mr. Ugliarolo, Mr. Vallette and Mr. Mellon, as well as the other evidence adverse to Mr. Lavin combine convincingly to demonstrate that Mr. Lavin knew or should have known his conversations were being tape recorded. Accordingly, the court concludes that no privilege attaches to these communications as the evidence shows that Mr. Lavin could not have intended these conversations to be confidential.

### 3. Discovery

■ Mr. Lavin maintains that, if the tapes are not protected by the confidential marital communications privilege, he should be afforded time for additional discovery to depose the BT employees whose sworn testimony was offered by the SEC. This matter is within the court's discretion. *SEC v. Dresser*, 628 F.2d 1368, 1388 (D.C.Cir.) (en banc),

*cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980). The court concludes that discovery is not warranted in this case.

■ Fed.R.Crim.P. 47 provides for the use of affidavits to support motions made to the court. Fed.R.Civ.P. 43(e) allows a court to decide motions, such as the SEC's motion to compel, based on affidavits presented by the parties and to receive depositions on the motion. Moreover, while additional discovery in these types of proceedings is within the discretion of the court, it is frowned upon in this circuit. *See Resolution Trust Corp. v. Frates*, 61 F.3d 962, 965 (D.C.Cir.1995). Any discovery allowed by a court in a subpoena enforcement proceeding should be kept to a minimum and limited to "interrogatories or affidavits." *Dresser*, 628 F.2d at 1388. Additional discovery "procedures are inappropriate in summary subpoena enforcement proceedings except in extraordinary circumstances." *Resolution Trust Corp.*, 61 F.3d at 965 (*quoting FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1091 (D.C.Cir.1992)); *see also Dresser*, 628 F.2d at 1388 (district courts should order such discovery only under "special circumstances"). Special circumstances exist when a person offers some evidence which demonstrates a lack of institutional good faith in an agency's investigatory policies. *United States v. Fensterwald*, 553 F.2d 231 (D.C.Cir.1977); *United States v. Marine Midland Bank*, 585 F.2d 36 (2d Cir. 1978).

In this case, Mr. and Mrs. Lavin have failed to show or even allege a lack of good faith on the part of the SEC. Consequently, discovery is not appropriate. Moreover, the court concludes that there is adequate evidence for the court to decide all issues of credibility and to reach a well-informed result.[29]

---

27. This call took place on July 21, 1994.

28. Mr. Lavin also directs the court's attention to a telephone call he had with a business associate from the New York office in which he asked the associate to initiate a conference call because Mr. Lavin wanted the call tape recorded. Mr. Lavin claims that this shows he did not believe his own telephone was being tape recorded. This may or may not be the case. The court recognizes myriad possibilities exist for the request.

29. Since the parties have ably and exhaustively briefed the issues in this case and the Lavins have presented all of their objections, the court finds it unnecessary to conduct a hearing. *See FTC v. Atlantic Richfield Co.*, 567 F.2d 96, 106 n. 22 (D.C.Cir.1977) (subpoena enforcement proceedings should be adversarial in character and should afford the parties an adequate opportunity to raise their objections to the subpoena).

### 4. Hearsay Evidence

██ Mr. and Mrs. Lavin argue that the hearsay evidence offered by the SEC cannot be used by the court to decide whether the confidential marital communications privilege is applicable. This argument is not supported by the Federal Rules of Evidence. Fed.R.Evid. 104(a) provides that in determining issues of privilege, a court is not bound by the rules of evidence.[30] In addition, Mr. and Mrs. Lavin rely on the same type of evidence as does the SEC.

### B. APPLICABILITY OF THE PRIVILEGE TO MRS. LAVIN

Mrs. Lavin argues that she should be allowed to independently assert the confidential marital communications privilege as to the conversations at issue. The relevant inquiry is whether Mrs. Lavin can claim as privileged the statements made to her by her husband despite the fact that the SEC is not attempting to show that she adopted the statements as her own. Her assertion of the confidential marital communications privilege fails.

██ The aim of the confidential marital communications privilege is to secure, "in the mind of the *communicating spouse*, freedom from apprehension" when communicating with his spouse. 8 *Wigmore on Evidence*, Section 2340, pp. 670–71 (McNaughton rev. 1961) (emphasis added). As such, the privilege belongs to the communicating spouse. *Id.* If the "sole purpose is to show the expressions and attitude" of the communicating spouse, then only the communicating

spouse can assert the privilege. *McCormick on Evidence*, Section 83 (4th ed. 1992).

██ The Lavins rely on *Blau v. United States*, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951) for the proposition that the privilege can be claimed by the listening spouse.[31] There the Supreme Court suggested that the privilege could be claimed by either spouse. *Id.* at 333, 71 S.Ct. at 302. The holding in *Blau*, however, is not applicable to the circumstances in this case. In *Blau*, the government failed to overcome the presumption that marital communications are confidential. *Id.* at 333, 71 S.Ct. at 302. More importantly, the listening spouse in *Blau* was being forced to testify with respect to the confidential communications that took place between himself and his spouse. *Id.* The *Blau* court therefore ruled that the listening spouse could invoke the privilege. This is a qualitatively different situation than the one currently before this court. Mrs. Lavin has not been asked to testify regarding Mr. Lavin's unilateral, tape recorded statements. Rather, the SEC has clearly stated that it has no interest in Mrs. Lavin's recollection of her husband's tape recorded statements, nor in her statements contained on the tape recordings.[32] As a result, Mrs. Lavin is in a different position than the listening spouse in *Blau*.

Since the SEC is not interested in utilizing Mrs. Lavin's responses to her husband's unilateral statements concerning his business dealings, the court concludes that Mrs. Lavin cannot assert the confidential marital communications privilege as to the conversations at issue.

---

**30.** Fed.R.Evid. 104(a) reads, in pertinent part,

> preliminary questions concerning ... the existence of a privilege, or the admissibility of evidence shall be determined by the court ... In making its determination it is not bound by the rules of evidence except those with respect to privilege.

There are no rules with respect to privilege that pertain to the evidence offered in the controversy before the court.

**31.** There is a conflict among the circuits with respect to whether a listening spouse may always claim the privilege. *See United States v. Hall*, 989 F.2d 711, 716 n. 8 (4th Cir.1993) (either spouse holds privilege); *In re Grand Jury Investi-*

*gation*, 603 F.2d 786, 788 (9th Cir.1979) (either spouse can invoke privilege); *United States v. Porter*, 986 F.2d 1014, 1018 (6th Cir.1993) (same); but *compare United States v. Evans*, 966 F.2d 398, 401 (8th Cir.1992) (only defendant spouse can claim privilege); *United States v. Sims*, 755 F.2d 1239, 1241 (6th Cir.1985) (same); *United States v. Jackson*, 939 F.2d 625, 627 (8th Cir.1991) (non-testifying, communicating spouse can invoke privilege); *United States v. Neal*, 532 F.Supp. 942, 947 (D.Colo.1982) (only communicating spouse holds privilege), *aff'd*, 743 F.2d 1441 (10th Cir.1984), *cert. denied*, 470 U.S. 1086, 105 S.Ct. 1848, 85 L.Ed.2d 146 (1985).

**32.** SEC's Reply Memorandum at 14 n. 11.

## C. WAIVER

Assuming *arguendo* that the privilege would attach and that Mrs. Lavin could assert the privilege independent of her husband, the court concludes that any such assertion of the privilege was waived by both Mr. and Mrs. Lavin.

The confidential marital communications privilege derives from the belief that it fosters a trust between the spouses which is essential to the growth and success of marriage. *Wolfle,* 291 U.S. at 14, 54 S.Ct. at 280. In addition, as a matter of public policy, society has an aversion to straying too far into the sanctity of the marital haven. *McCormick on Evidence,* Section 82 (4th ed. 1992).

 Testimonial privileges, such as the confidential marital communications privilege between spouses, are compromises between the justice system's unyielding search for the truth and society's desire to foster certain relationships. *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980). Consequently, privileges must be construed strictly and "accepted 'only to the very limited extent that ... excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'" *Id.* (*quoting Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1453, 1454, 4 L.Ed.2d 1688 (1960) (Frankfurter, J., dissenting)); *see also University of Pennsylvania v. E.E.O.C.,* 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990) (privileges should be narrowly construed).

 As a result, the holder of a privilege is responsible for guarding the privilege with all the means at his or her disposal. *In re Sealed Case,* 877 F.2d 976, 980 (D.C.Cir.1989) (attorney-client privilege). The Lavins have not adequately safeguarded the confidential

marital communications privilege with the requisite vigor and have, therefore, waived any privilege that may otherwise have attached. First, the Lavins have not actively sought to secure the copies of the tapes already in the possession of three other organizations.[33] Second, by inserting a portion of the taped conversations in their pleadings, the Lavins have waived the privilege.

### 1. Possession of The Tapes by Other Entities

Privileges must be zealously guarded by their holder. *In re Sealed Case,* 877 F.2d at 980. Privileges must be treated as if they are "crown jewel[s]." *Id.* The Lavins have not given their conversations such treatment. Three organizations currently have tape recordings of the conversations. The Lavins, however, have not instituted any proceedings in order to retrieve the tapes or prevent their further inspection by these entities.[34]

Mr. Lavin states that sometime after July 1994, he learned that conversations on his Chicago telephone were being tape recorded.[35] Mr. Lavin asserts that when he became aware of this fact, he ordered the taping stopped.[36] Mr. Vallette testified that after receiving this request, he immediately had Mr. Lavin's telephone taken off of the taping system.[37] It is undisputed by the parties that the tape-recording of Mr. Lavin's telephone ceased as of September 2, 1994.

Even though Mr. Lavin knew by no later than September 2, 1994 that any telephone conversation he had engaged in previous to that date with his wife had been tape recorded, he did not seek to retrieve any of the recordings from BT. Between September 2, 1994 and mid-November 1994, Mr. Lavin did nothing to minimize the damage to the confidentiality of his telephone conversations with

---

**33.** The three organizations which have copies of the tapes are: (1) Bankers Trust, (2) Bankers Trust's counsel; and (3) The Federal Reserve Bank. The Federal Reserve Bank is conducting its own investigation of BT.

**34.** The Lavins did assert the confidential marital communications privilege against all three entities but have taken no further action to protect the confidentiality of the taped conversations.

**35.** Testimony of Mr. Lavin given April 20, 1995 at 199 (attached as Ex. F to O'Sullivan Aff.).

**36.** *Id.* at 200.

**37.** Testimony of Art Vallette at 33 (attached as Ex. E to O'Sullivan Aff.).

his wife caused by the tape recording. *See United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir.1992). Such a "failure to act" allowed " 'the mantle of confidentiality' " surrounding the telephone conversations to be impugned. *Id. (quoting Permian Corp. v. United States*, 665 F.2d 1214, 1220 (D.C.Cir. 1981)).

Not until mid-November 1994, when the Lavins were notified that copies of the tapes had been turned over to the Federal Reserve Bank of New York, did the Lavins alert BT and its counsel that they would be asserting the confidential marital communications privilege as to the tape recorded conversations. Furthermore, it was not until January 1995 that the Lavins actually requested that BT turn over the tapes.[38] This request was denied. The Lavins did nothing at that point to attempt to compel BT, its attorneys, or the Federal Reserve Bank to turn over the outstanding copies of the tapes.[39] More significantly, when the Lavins intervened in the Ohio case,[40] to which BT was a party, the Lavins did not request that that court order BT to turn over the tapes to them. The Federal Reserve Bank, BT, and its four outside law firms still enjoy unfettered access to the tapes. Consequently, the Lavins' actions are not consistent with zealous protection of confidential marital communications and, as such, constitute a waiver of any privilege that may have attached to the conversations at issue in this case.

### 2. Disclosure of Contents of Conversations

■ If a privileged communication is voluntarily revealed to a third party, the privilege is waived as to that communication. *United States v. AT & T*, 642 F.2d 1285

(D.C.Cir.1980) (attorney-client privilege). The reasons for such disclosure are irrelevant so long as the disclosure is voluntary. *In re Sealed Case*, 877 F.2d at 980 (court will not "distinguish between various degrees of voluntariness"). Even inadvertent disclosures have triggered an implied waiver of privileges. *See Id.; Wichita Land & Cattle Co. v. American Federal Bank*, 148 F.R.D. 456 (D.D.C.1992); *In re U.M.W.*, 156 F.R.D. 507 (D.D.C.1994).

■ Moreover, voluntary disclosure to a third party in order to gain an advantage in litigation waives the privilege. *In re Sealed Case*, 676 F.2d 793, 818 (D.C.Cir.1982). In fact, anything "short of *court-compelled* disclosure" or some other extraordinary circumstance will waive the confidential attorney-client privilege.[41] *In re Sealed Case*, 877 F.2d at 980 (emphasis added); *see also In re Subpoenas Duces Tecum to Fulbright & Jaworski*, 99 F.R.D. 582, 585 (D.D.C.1983), *aff'd*, 738 F.2d 1367 (D.C.Cir.1984) (unrequested and uncompelled disclosure to SEC waives privilege). The attorney-client privilege seeks to foster a trusting and open relationship between attorney and client, and this goal is similar to that which the confidential marital communications privilege hopes to impart upon the institution of marriage. *United States v. Byrd*, 750 F.2d 585, 589 (7th Cir.1984). Therefore both privileges must be narrowly construed because they are "in derogation of the search for the truth . . ." *Id.*

Presently, by selectively disclosing a portion of the taped conversations to gain a litigation advantage, the Lavins have waived any privilege that may have attached to the conversations.[42] It would be inequitable for

---

38. O'Sullivan Aff. at 2.

39. The Lavins have only instituted legal proceedings against one entity, Procter & Gamble, which attempted to gain access to the tapes. *See Procter & Gamble v. Bankers Trust Co.*, 909 F.Supp. 525 (S.D.Ohio 1995).

40. *See, supra*, n. 39.

41. Involuntary disclosures, such as when stolen documents have been revealed to the public, have been held to be an extraordinary circumstance preventing waiver. *In re Grand Jury Pro-*

*ceedings Involving Berkley & Co.*, 466 F.Supp. 863, 869 (D.Minn.1979), *aff'd*, 629 F.2d 548 (8th Cir.1980).

42. In the Lavins' Memorandum in Opposition to SEC's Application for Enforcement, the following excerpt is included from one of the conversations at issue in this case:

Mr. Lavin: "This line is not taped."
Mrs. Lavin: "No."
Mr. Lavin: "No."

*See* Jack and Robin Lavin's Memorandum in Opposition to SEC's Application for Enforcement at 9.

the court to allow the Lavins to selectively disclose conversations at issue in this case and then foreclose the opportunity for the SEC to examine the tapes and the context of the statements embraced by them. *See In re Sealed Case*, 676 F.2d at 818.[43] Therefore, the court concludes that the Lavins' actions constitute a waiver of any confidential marital communications privilege that may have attached to their conversations.

Accordingly, it is, on this 13 day of August 1996,

**ORDERED** that Jack and Robin Lavin comply with the subpoena issued to Jack Lavin and disclose the tapes of the conversations at issue to the court; and it is

**FURTHER ORDERED** that the court will issue reacted transcripts of the conversations to the SEC unless Jack and Robin Lavin file a notice of appeal within sixty (60) days of the entry of this order. *See* Fed. R.App.P. 4(a)(1).

**SO ORDERED.**

---

43. The court notes that in this Circuit *ex parte in camera* submissions are strongly discouraged because "[i]t is the hallmark of our adversary system that we safeguard party access to the evidence tendered in support of a requested court judgment. The openness of judicial proceedings serves to preserve both the appearance and the reality of fairness in the adjudications of United States courts." *Abourezk v. Reagan*, 785 F.2d 1043, 1060–1061 (D.C.Cir.1986).